**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 8 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

FIRDIE EARL WHITE,

　　　　Defendant - Appellant.

No. 02-2118

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CR-01-741-LH)**

---

Todd B. Hotchkiss, Frechette & Associates, P.C., Albuquerque, New Mexico, for Defendant - Appellant.

James Miles Hanisee, Assistant United States Attorney (David C. Iglesias, United States Attorney, and Laura Fashing, Assistant United States Attorney, on the brief), Albuquerque, New Mexico, for Plaintiff - Appellee.

---

Before **LUCERO** , **HOLLOWAY** , and **ANDERSON** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

　　　Defendant Firdie Earl White was convicted of possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and

924(a)(2). He appeals the district court's denial of his motion to suppress his identity and the subsequent discovery of his status as a convicted felon following his unlawful arrest. We affirm, although on a different basis than the district court.

## BACKGROUND

On December 22, 2000, an Albuquerque, New Mexico, police dispatcher informed Albuquerque police officer Anthony Simballa that an anonymous tip indicated that individuals were suspected of selling drugs at 540 Cardena, Apartment C. Officer Simballa, along with Officer Daniel Porter, responded and went to the apartment complex at that address.

Upon their arrival at the apartment complex, they encountered Francisco Navarez and Stephanie Holguin in the parking lot. When asked if they lived there, Navarez responded that he lived in Apartment C. When Officer Simballa asked Navarez if he would mind talking to the officers in the apartment, Navarez replied, "No, follow me." R. Vol. IV at 8-9. The officers followed Navarez to the apartment, where Navarez opened the door.

When the door to Apartment C was opened, Officer Simballa saw five people inside the apartment, one of whom, later identified as defendant White, was holding a gun and pointing it towards the floor. When White saw the

officers, he turned his back to the officers.     Id. at 11.  When the officers saw the gun, Officer Porter yelled, "gun."     Id.  Both officers drew their weapons and told everyone to put their hands up.  White placed the gun he was holding on a table and raised his hands.

Officer Simballa secured the gun and removed the magazine, which contained six bullets, although the chamber was empty.  Officer Simballa handcuffed White and patted him down.  During the pat-down, Officer Parker stood in the doorway with his gun pointed towards the ground in a "low ready" position.  While he was patting down White, Officer Simballa felt a small hard object in White's pocket. When asked what it was, White told Officer Simballa, "Take it out."   Id. at 15.  The object turned out to be a small dental floss container, which made a rattling sound when the officer removed it from White's pocket.  Officer Simballa set it aside while he patted down the other individuals in the apartment, finding no other weapons.  When he returned to and opened the dental floss container, the officer discovered four rocks of what turned out to be cocaine.  The officers placed White under arrest, and Officer Porter read him his Miranda rights.

After White was advised of his rights, Officer Simballa asked him what the substance was that was inside the dental floss container, and White responded that it was crack cocaine.  When asked what he was doing with the gun, White replied

that he was thinking of buying it. At some point, White either gave Officer Simballa an identification card or told the officer his name, date of birth and social security number. Officers Simballa and Porter checked the National Crime Information Channel ("NCIC") and learned that there was a warrant outstanding for White's arrest for traffic violations. They informed White that he had an outstanding warrant. At the hearing on White's motion to suppress, Officer Simballa testified that the existence of the outstanding warrant was "also a basis for [White's] being arrested at that time." Id. at 20.

The officers took the gun, the magazine with bullets, the dental floss container and the crack cocaine as evidence, and White was booked into the Bernalillo County Detention Center "on the possession of controlled substance and his warrant." Id. After White's arrest, subsequent inquiries revealed that he had previously been convicted of a felony. White was therefore indicted under 18 U.S.C. §§ 922(g)(1) and 924(a)(2) for possession of a firearm by a person previously convicted of a felony.

White moved to suppress all evidence obtained in connection with his arrest, as well as the statements he made, on the ground that the cocaine was seized illegally. He also sought suppression of his identity and the subsequent investigation which led to the discovery that he was a felon. The district court conducted a hearing and granted White's motion in part and denied it in part. The

court concluded that, while the initial pat-down was justified, White's consent to the removal of the dental floss container was not voluntary. Accordingly, the search leading to the discovery of the crack cocaine was invalid, and the court therefore suppressed the crack cocaine. The court also suppressed White's statements made following his arrest as fruits of an unlawful search. It refused to suppress White's identity, in reliance upon INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), and it refused to suppress the gun, concluding that the officers saw the gun when they lawfully entered the apartment and exigent circumstances gave the officers probable cause to seize it.

After a mistrial was declared in White's trial, shortly after jury selection began, White pled guilty pursuant to a plea agreement, reserving his right to appeal the district court's denial of his motion to suppress his identity, the subsequent investigation which led to the discovery of his status as a felon, and the gun. He was sentenced to twenty-one months in prison, three years of supervised release, and was ordered to pay a $100 special assessment. White appeals, arguing the court erred in failing to suppress his identity and the investigation leading to the discovery of his felon status.

## DISCUSSION

When reviewing the denial of a motion to suppress, "we review the district court's factual findings for clear error, its conclusions of law de novo, and view the evidence in the light most favorable to the prevailing party." United States v. Gallegos , 314 F.3d 456, 458 (10th Cir. 2002).

The district court denied the suppression of White's identity. In addition to arguing that White's identity was not suppressible, [1] the government had also asserted that, because the officers discovered that there was a warrant issued for White for traffic violations, his status as a convicted felon would have been inevitably discovered following his lawful arrest under that warrant. The court declined to apply the inevitable discovery doctrine, finding as follows:

> Assuming the search of Defendant had ended when the pat down uncovered no weapons or contraband, it is not clear from Officer Simballa's testimony that the officers would have, as a matter of course, submitted Defendant's name to NCIC, based solely on the fact that he was holding a firearm for which he could not prove ownership. No testimony was offered regarding APD's protocol, if

---

[1]The government also argued that White's identity was not subject to suppression, relying on Lopez-Mendoza's statement that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search or interrogation occurred." 468 U.S. at 1039. See United States v. Roque-Villanueva, 175 F.3d 345 (5th Cir. 1999); United States v. Guzman-Bruno, 27 F.3d 420, 422 (9th Cir. 1994). Because we may resolve this case on the basis of the inevitable discovery doctrine, we need not address this issue.

any, in such a situation or Officer Simballa's personal mode of operation.

Mem. Op. and Order at 8, R. Vol. I, Tab 25.

Even though the district court declined to apply the inevitable discovery doctrine, "we may affirm on any grounds supported by the record." Ruiz v. McDonnell , 299 F.3d 1173, 1182 (10th Cir. 2002). We hold that the record supports application of the inevitable discovery doctrine to uphold the district court's denial of White's motion to suppress his identity and the subsequent discovery of his status as a felon.

Under the inevitable discovery doctrine, even if the initial search and arrest was unlawful, "the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means." United States v. Souza , 223 F.3d 1197, 1202 (10th Cir. 2002). "The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." Id. at 1203. In determining whether the government has met its burden of proof, we consider "demonstrated historical facts," not "speculative elements." Nix v. Williams , 467 U.S. 431, 444 n.5 (1984). Accordingly, in this case we may affirm the district court's refusal to suppress White's identity and the subsequent revelation of his prior felony if we conclude that the government proved by a preponderance of the evidence that it would have obtained his identity and information about his prior

conviction even though the search which revealed the cocaine was illegal. We hold that the demonstrated historical facts in the record establish that the government met that burden.

First, White does not contest the government's authority, during a brief investigatory detention, to run a person's name through the NCIC database. See United States v. Soto-Cervantes, 138 F.3d 1319, 1323 n.2 (10th Cir. 1998) (noting defendant's concession "that the pat-down and the requests for identification were permissible if the court determined that the detention was supported by reasonable suspicion"). Thus, there was, and there would be, nothing improper in the officers' checking White's name against the NCIC database.

Further, a police officer may request identification from any person he encounters, and, if the individual responds, as White evidently readily did, the officer may run that identification through the NCIC database. White does not dispute the district court's conclusion that the initial pat-down of himself and the other individuals at the apartment was justified, given the tip about drug activity, and the discovery of the five individuals in the apartment, one of whom, White, was holding a gun whose ownership was undetermined. While the district court found that it was unclear whether a routine NCIC check would have been run on an individual in White's situation, the record reveals that the officers in fact did

run NCIC checks on other individuals in the apartment. Officer Simballa testified as follows:

> When [White] gave me his name, his date of birth, social, I relayed that message or that information <u>along with the other ID's that we found on the subjects or whatever their names were</u> to Officer Porter, who then switched to the national crime information channel on our radio system and ran <u>them</u> to see if <u>they</u> had any outstanding warrants.

R. Vol. IV at 19 (emphasis added). That testimony establishes that NCIC checks were run on multiple individuals at the apartment. [2] Indeed, the NCIC check revealed an outstanding warrant on one of the individuals (Navarez) besides White, and Navarez was arrested along with White. Thus, there is a solid implication that the officers routinely ran NCIC checks on persons briefly detained, following the discovery of a weapon in connection with an investigation into alleged drug activity, and they in fact did so in this case. We find the record establishes that the government proved by a preponderance of the evidence that, regardless of the illegal search of the dental floss container, the officers would have routinely and lawfully run an NCIC check on White, which would have revealed his outstanding arrest warrant. [3] Cf. <u>United States v. Santana-Garcia</u>, 264

---

[2]Citing the testimony quoted above, the government averred in its motion for reconsideration of the district court's refusal to apply the inevitable discovery doctrine that the officers ran NCIC checks on all of the individuals in the apartment. White does not refute that representation.

[3]We recognize, of course, that we review any factual findings made by the

(continued...)

F.3d 1188, 1192 (10th Cir. 2001) (noting that legality of detention is measured by an objective standard and the fact "[t]hat an officer did not believe probable cause existed to detain a suspect does not preclude the Government from justifying the suspect's detention by establishing probable cause").

The record also contains ample evidence supporting the conclusion that, once the NCIC check revealed his outstanding warrant, White would have been lawfully arrested and booked into the Bernalillo County Detention Center. Officer Simballa testified that the existence of the outstanding warrant was "also a basis for [White's] being arrested." R. Vol. IV at 20. He further testified that White was booked into the Bernalillo County Detention Center "on the possession of controlled substance and his warrant." Id. (emphasis added). Officer Simballa testified that it was his personal practice to "enforce all the metropolitan court bench warrants that [he] come[s] across." Id. at 44. The fact that Navarez was also booked on an outstanding warrant further supports the government's position below that White would have been arrested on his own outstanding warrant.

_____

³(...continued)
district court for clear error. It is unclear from the district court's opinion whether it found as a matter of fact that the officers would or would not routinely run NCIC checks on individuals in White's situation. To the extent the district court found that the officers did not routinely run such checks, or did not do so in this case, we conclude that finding was clearly erroneous.

-10-

Thus, White was lawfully arrested and detained at the Detention Center, where further investigation revealed his prior felony conviction.

Finally, we find further support for our conclusion in this case by considering the purpose of the exclusionary rule. As the Supreme Court stated:

> We need not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

Wong Sun v. United States, 371 U.S. 471, 487-88 (1963) (quotations omitted). Accordingly, we do not conclude that White's identity and the record of his prior felony conviction are suppressible simply because "but for" the illegal search and seizure of the cocaine, his identity and status as a felon would not have been discovered. Rather, the question is whether the police exploited that illegality to discover his identity and felon status.

In this case, it can hardly be said that the police exploited the illegal search to obtain White's identity and, eventually, information on his prior conviction. To the contrary, in connection with a brief investigatory detention to determine whether a tip about drug activity had any validity, and after seeing White holding a gun which nobody in the apartment was authorized to possess, the police asked his name, he promptly gave it to them, they ran an NCIC check on it and

-11-

determined there was an outstanding warrant. He was arrested for both the illegally obtained cocaine and the warrant. At that point, the police were completely unaware of the fact that White had a prior felony conviction. After being booked, the police, at some later date, determined that he had a prior felony conviction, presumably from public records predating any illegality in the police officers' conduct relating to White's arrest. The purpose of the exclusionary rule is in no way compromised by refusing to suppress that information. "The exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality." United States v. Crews, 445 U.S. 463, 475 (1980).

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.