**UNITED STATES of America, Plaintiff,**

v.

**Lester Jay MABE, Defendant.**

**No. 2:03–CR–986.**

United States District Court,
D. Utah,
Central Division.

June 1, 2004.

Paul Gotay, Gotay Law Office, Salt Lake City, UT, for defendant.

Michele M. Christiansen, U.S. Attorney's Office, Paul G. Amann, Utah Attorney General's Office, Children's Justice Division, Salt Lake City, UT, for plaintiff.

TED STEWART, District Judge.

This matter came before the court on February 17, 2004, for an evidentiary hearing on Defendant's Motion to Suppress. A briefing schedule was set and the court asked for supplemental briefing to address *Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Supplemental briefing is now complete.

## I. FINDINGS OF FACT

In 2003, members of the Utah Internet Crimes Against Children Task Force received information from the Dallas Police Department identifying persons who had allegedly used credit cards to purchase material via a website called Sitekey. That website processed credit card orders for child pornography. When law enforcement officers closed down the website, they sent lists of names obtained from the site to all 50 states. Defendant's name was on the list sent to Utah.

On September 22, 2003, Agent Jeff Ross of the FBI and Detective Fred Ross of the Salt Lake City Police, members of the task force, went to interview Defendant Lester Mabe at his place of employment. The officers were in plain clothes and their guns were not visible. They introduced themselves to Defendant at his work saying they were there to investigate a property crime. The purpose of this ruse was to spare Defendant embarrassment at work due to the nature of their inquiries.

When they reached a private area of Defendant's work they told him that they had information that he had used his credit card to purchase illegal material over the Internet. Detective Ross told Defendant that they had a search warrant and were prepared to execute it at his residence. They explained to Defendant that, rather than execute a search warrant, his cooperation was desired. The officers did not have a search warrant at that time. The officers further told Defendant that he did not have to consent to a search and that they would execute the search warrant if he did not consent. Defendant responded that he did not want to be on television and that he wanted to cooperate.

The officers suggested that he walk out with them and tell people at work that he was going to look at property involved in a property crime. Defendant walked out with the officers to their car parked around the corner and he got into the back seat with Detective Ross. For officer safety, he was checked for weapons. He sat in the back seat with Detective Ross on the drive to his apartment. Defendant was not handcuffed or restrained.

Upon arrival at his residence, Detective Ross gave Defendant a preprinted FD26 Consent to Search Form and went over it with him. Detective Ross again explained to Defendant what they were looking for and that he did not have to give consent to the search. Defendant said he wanted to cooperate and signed the consent form, which included the following handwritten description of the places or things to be searched:

APT 3 3363 S. 1300 East # 368, SLC, UT 84106 TO INCLUDE ALL AREAS OF APT TO INCLUDE PERSONAL P.C.

Def's Ex. D.

Defendant's computer was near his bed at the time of the search. He was asked if he had weapons and indicated he had some hunting rifles. Detective Ross then asked Defendant where the illegal material was located. Defendant responded by leading Detective Ross and Special Agent Ross into his bedroom area where he opened a combination lock on a closet, and then opened another lock on a trunk and showed the officers dozens of printed child pornography images and many floppy disks bearing labels of known child pornography web sites. The closet also contained four or five growing marijuana plants.

The material at Defendant's apartment was more than the officers had expected to find and they called in other members of the task force. Within 15 minutes, five or six other members of the task force arrived, including an evidence technician and a photographer.

Defendant's apartment had been very messy when the officers arrived. The officers told Defendant that they wanted to leave the mess of his apartment to go to their office to interview him concerning the material they found, but that he did not have to consent to an interview. They advised him that they did not intend to incarcerate him. Defendant agreed and was then transported from his residence to the FBI's Salt Lake City office. Defendant was not handcuffed or otherwise restrained. On the way to the FBI office, the officers asked Defendant if he wished

to have anything to eat or drink and he declined.

Defendant indicated that he would be willing to cooperate and answer questions posed by the officers. Defendant inquired as to whether he would be arrested. The officers indicated that they did not intend to arrest him. The officers accompanied Defendant to an interview room. An Advice of Rights form, containing information necessary for a *Miranda* warning, was read aloud to Defendant and he was permitted to read the form himself. After he read the form, Defendant was asked if he was willing to answer questions. It was explained to him that he could answer questions he felt comfortable answering, that he could refuse to answer questions that he did not wish to answer, and that he could end the interview at any time. Defendant indicated that he was willing to answer questions posed by officers, but was unwilling to sign the form. The court finds credible Agent Ross' testimony that Defendant was read his rights from the form, refused to sign the form, but agreed to and did answer questions.

Upon consenting to the interview, Defendant stated that got the images off the Internet and that he purchased them with a credit card. Although the officers did not intend to incarcerate Defendant at the time, after the interview, their superior insisted that they do so.

## II. DISCUSSION AND CONCLUSIONS

Defendant originally contended that the evidence of his statements should be suppressed for a *Miranda* violation and that evidence obtained from the search of his apartment should also be suppressed because the search exceeded the scope of his written consent. In his Supplemental Brief, Defendant argues that under *Bumper* there was no consent to search.

### A. Consent to Search

 The court need not address the parties' arguments regarding the scope of the written consent to search because it finds that pursuant to *Bumper*, there was no valid consent to search. In *Bumper*, the United States Supreme Court held:

> The issue thus presented is whether a search can be justified as lawful on the basis of consent when that "consent" has been given only after the official conducting the search has asserted that he possesses a warrant. We hold that there can be no consent under such circumstances.

> \* \* \*

> When a law enforcement officer claims authority to search a home under a warrant, he announces, in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.

391 U.S. at 551, 88 S.Ct. 1788.

The government argues that *Bumper* is not applicable because it has a voluminous negative indirect history and was modified by the decision five years later in *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), which announced a totality of the circumstances analysis for consent to search. The government also attempts to distinguish *Bumper* on its facts and because the officers had probable cause to obtain a search warrant.

The court finds that *Bumper* remains good law. For example in *U.S. v. Leary*, 846 F.2d 592, 598 (10th Cir.1988), the Tenth Circuit quoted and applied *Bumper* as well as the Supreme Court's later search and seizure cases such as *Schneckloth*. Further, the fact that *Bumper* con-

tinues to be frequently distinguished in reported cases supports reliance on its continuing vitality.

■ The court finds that the fact that the officers arguably had probable cause to search the apartment does not make *Bumper* inapplicable. In the case relied upon by the government, *U.S. v. Kaplan*, 895 F.2d 618, 622 (9th Cir.1990), the officer told the Defendant that a warrant "could be" obtained if Defendant would not consent to search. The Ninth Circuit examined whether consent obtained by the *threat* to obtain a warrant while the Defendant was under arrest invalidated the subsequent search. The Ninth Circuit held because it was apparent on the facts of the *Kaplan* case, including that no coercion was exercised and probable cause existed for a warrant, that the consent was voluntary.

In contrast, the present case does not involve a threat to obtain a warrant. It involves a clear statement that the officers *had* a warrant *and,* if Defendant would not consent, they were prepared to execute it at his residence. (Trans. at 11–12 and 34). As in *Bumper*, the government's burden of showing consent cannot be "discharged by showing no more than acquiescence to a claim of lawful authority."

■ The government contends that the various factors usually examined under the "totality of the circumstances" approach adopted in *Schneckloth*, weigh in favor of finding that the consent is voluntary. Under *Schneckloth*, the "question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Factors that may be relevant to determining voluntariness include such things as (1) the age, intelligence, and education of the defendant; (2) the length of any detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041.

We have a two-part test for determining the validity of a consent search. *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir.1996). Under this test, the Government must: (1) "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given"; and (2) "prove that this consent was given without implied or express duress or coercion." *Id.* (quoting *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir.1996)). *U.S. v. Taverna*, 348 F.3d 873, 878 (10th Cir.2003).

■ In the present case, as in *Bumper*, the fact that consent was obtained only after the officers asserted that they were acting under lawful authority of a warrant, is coercion because they, in effect, announced that the Defendant had no right to resist the search. *Bumper*, 391 U.S. at 551, 88 S.Ct. 1788. "Where there is coercion there cannot be consent," *id.*, and the second step of the two-part test cannot be met. The court will grant Defendant's Motion to Suppress the evidence obtained pursuant to the search of the apartment.

B. Statements

Defendant contends that he was in custody from the time he was picked up at work. Therefore, he contends that his statements prior to questioning at the FBI office should be suppressed because he was in custody but not informed of his *Miranda* rights at the time they were made. Defendant also contends that he was not given a *Miranda* warning before his statements at the FBI office. The government contends that Defendant was not in custody and that he was read his

*Miranda* rights at the FBI office but refused to sign the acknowledgment.

Subsequent to the briefing on those issues, the court requested supplemental briefing on the applicability of *Bumper.* The court's ruling on the illegality of the search, requires that Defendant's statements made during the search be suppressed, whether or not Defendant was in custody at the time.

■ As explained by the U.S. Supreme Court, even if statements are not found to be in violation of the Fifth Amendment, they must ·be suppressed if obtained in violation of the Fourth Amendment. *Brown v. Illinois*, 422 U.S. 590, 601, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In *Brown,* the court held that *Miranda* warnings before two statements was insufficient to attenuate the taint of an unconstitutional arrest. In addition to a *Miranda* warning, the following factors should also be considered: the "temporal proximity of the arrest and the confession; the presence of intervening circumstances; and particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S.Ct. 2254 (internal citations and quotations deleted).

In *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), the Court elaborated on the rule announced in *Brown:*

> [*Brown* and other cases] stand for the familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality. We have emphasized, however, that attenuation analysis is only appropriate where, as a threshold matter, courts determine that the challenged evidence is in some sense the product of illegal governmental activity.

495 U.S. at 18, 110 S.Ct. 1640.

■ In this case, the statements made at the apartment were made in response to requests and questions undertaken by the officers as part of the search. For the reasons stated above, there was no valid consent to search. Defendant's statements made during the illegal search are the direct result of the officer's acts in coercing consent by asserting they had a warrant and, if Defendant did not consent, they would execute that warrant. As such they are "indirect fruit of an illegal search" because "they bear a sufficiently close relationship to the underlying illegality," and must be suppressed. *Harris,* 495 U.S. at 18–19, 110 S.Ct. 1640.

■ However, considering the analysis set forth in *Brown and Harris, supra,* the same is not true for the statements made by Defendant at the FBI offices. There was a clear break in the events between the search of the apartment and the later questioning at the FBI offices. Defendant went voluntarily with the officers and was not restrained. The officers told him, truthfully, that they did not intend to incarcerate him at that time. He was offered food and drink. He was at a new, and more formal, location, away from the coercive atmosphere of the search. There was nothing coercive or threatening about the officers' behavior in asking him to go to the FBI office, or about their behavior after he agreed to do so. Although it was the same day, the voluntary move to a different physical location and the *Miranda* warnings are intervening circumstances that serve as a clear break in temporal proximity between the arrest and his statements. The purpose of the interview was to obtain a different form of evidence than the search and Defendant was clearly informed before the interview started of his rights. Unlike the situation with the search, the information about his *Miranda* rights was not accompanied by an assertion of lawful authority that would have led Defendant to believe he must

submit to questioning. After it was clearly explained to Defendant that he did not have to answer questions, he voluntarily made the statement about having purchased material from the Internet using a credit card.

Further, the information obtained from Sitekey had provided the officers grounds to question Defendant, prior to the search of his apartment. *See U.S. v. White,* 326 F.3d 1135, 1140 (10th Cir.2003) ("The exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality.") (quoting *U.S. v. Crews,* 445 U.S. 463, 475, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980)).

The court finds that Defendant's statement at the FBI office is not tainted by the prior illegal search. Neither does the court find any *Miranda* violation. Accordingly, the court will not suppress Defendant's statement made at the FBI office.

### ORDER

Based upon the foregoing, it is therefore

ORDERED that Defendant's Motion to Suppress is GRANTED, IN PART, as to the evidence and statements obtained pursuant to the search of Defendant's apartment. It is further

ORDERED that Defendant's Motion to Suppress is DENIED as to any statement made by Defendant while at the FBI offices. It is further

ORDERED that the time from the filing of the Motion to Suppress through the date of the entry of this Order is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J).