FILED
United States Court of Appeals
Tenth Circuit

June 5, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MICHAEL ARCHANGEL CINTRON,

      Defendant - Appellant.

No. 11-6316
(D.C. No. 5:11-CR-00153-R-1)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **O'BRIEN,** and **MATHESON**, Circuit Judges.

      Michael Archangel Cintron was charged with one count of being a felon in

possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  He filed two motions to

suppress—one to suppress general unspecified evidence and another to suppress

statements that he made during the events leading up to his arrest.  The district court

denied both motions.  Mr. Cintron then entered a conditional guilty plea.  He now appeals

---

      [*]After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  See Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App.
P. 32.1 and 10th Cir. R. 32.1.

the district court's denial of his motions to suppress. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.     BACKGROUND

### A. *Factual History*

On April 18, 2011, Shawn Reed was working as a security guard at the OK Corral Club, a bar in Oklahoma City. Mr. Reed was also a part-time reserve officer for the Boley Police Department and had 27 years of law enforcement experience. He had worked off-duty security jobs for the past 20 years. Although the Boley Police Department knew of his work at the OK Corral Club, it was not involved in the arrangement of this employment.

When Mr. Reed worked at the OK Corral Club, he did not wear his police uniform or his badge. Instead, he wore a shirt that said "Security." Mr. Reed also carried a firearm and a personal set of handcuffs.

On the night of April 18, 2011, Mr. Reed was working with the outside security team—a group that patrolled the parking lot area at the OK Corral Club. Mr. Reed testified at the suppression hearing that his supervisor told him that other security guards had seen "somebody that was flashing a gun or that they—had pulled their shirt up and they saw a gun while they [were] talking to some people." ROA, Vol. 2, at 11. His supervisor was concerned about the incident because, according to Mr. Reed's testimony, "there [were] some people earlier in the night that had threatened to go get guns and come back and shoot some of the inside bouncers that had thrown them out." *Id.*

Mr. Reed testified that the only description his supervisor gave him was that the individual with the gun "[was] in a red Camaro" and was with other men "that were in a black SUV." *Id.* at 12. Around 3 a.m., Mr. Reed entered the parking lot to investigate. He observed three vehicles: a black SUV, a truck, and a red Camaro. Both doors of the Camaro were open. Mr. Reed approached the Camaro and looked inside to make sure no one was lying in the back seat.

Mr. Cintron then walked toward the Camaro and told Mr. Reed that it was Mr. Cintron's car. Sometime during this encounter, Mr. Reed unholstered his weapon. When Mr. Cintron claimed the Camaro as his vehicle, Mr. Reed pointed his gun at Mr. Cintron. He instructed Mr. Cintron to step to the side and put his hands on the car.

Mr. Cintron complied with Mr. Reed's requests. Mr. Reed proceeded to pat him down. He found a .380-caliber automatic firearm in Mr. Cintron's waistband. Mr. Reed pulled the gun out of Mr. Cintron's waistband and placed it behind him on the ground. Mr. Reed testified that, when he found the gun, Mr. Cintron said: "Hey man, I've just got that . . . because . . . I was picking up my sister and the last time that I was up here some guys jumped me." *Id.* at 20. Mr. Reed finished his patdown search and handcuffed Mr. Cintron.

When the head of outside security at the OK Corral Club learned of the situation, he called the Oklahoma City Police Department. While Mr. Reed and Mr. Cintron were

waiting for the police to arrive, Mr. Cintron repeated his statement about why he had the firearm. He also stated that he had "a tail" on him.[1]

Sergeant David Van Curen, a member of the Oklahoma City Police Department, was the first on-duty officer to respond to the scene. When Sergeant Van Curen arrived, Mr. Reed handed him the firearm and explained what had transpired. Sergeant Van Curen then secured and cleared the firearm.

Mr. Reed testified that during his conversation with Sergeant Van Curen, Mr. Cintron "jumped in on the conversation," *id.* at 24, and repeated his explanation of why he was at the club and had the firearm. According to Mr. Reed, Mr. Cintron said, "Hey, you know, that's it, man, that's the only reason I got that and the only reason I'm up here is to get my sister." *Id*. at 25.

Sergeant Van Curen testified at the suppression hearing that after Mr. Cintron made this statement about the firearm, Sergeant Van Curen took off the handcuffs that Mr. Reed had applied, put on a different pair, and placed Mr. Cintron in a squad car. Sergeant Van Curen then performed a records check on Mr. Cintron to determine if he had a permit for the firearm. He discovered that Mr. Cintron was a convicted felon and that he had five outstanding city warrants. Sergeant Van Curen then told Mr. Cintron that he was under arrest.

---

[1]Mr. Reed explained that "a tail" is "a slang term . . . used by prisoners . . . to indicate whether [they have] paper time, [a] suspended sentence and so forth, or . . . if [they're] on parole or probation." ROA, Vol. 2, at 23.

**B.** *Procedural History*

Mr. Cintron was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He filed two motions to suppress. The first sought to suppress "the evidence against him," Supp. ROA, Vol. 1, at 10, but focused primarily on Mr. Reed's conduct rather than any particular evidence. The second sought to suppress the statements he made in the presence of Mr. Reed and Sergeant Van Curen.

The district court denied both motions. It held that Mr. Reed was acting as a private citizen rather than a state actor and that it was reasonable for Sergeant Van Curen to detain Mr. Cintron to conduct an investigation. The district court also refused to suppress Mr. Cintron's statements because Mr. Reed was not a state actor and because Mr. Cintron had not been interrogated.

After the district court denied Mr. Cintron's motions to dismiss, Mr. Cintron entered a conditional plea. The district court sentenced him to 21 months in prison and three years of supervised release and imposed a $100 special assessment.

## II.    DISCUSSION

On appeal, Mr. Cintron challenges the district court's denial of his motions to suppress. He argues that the Fourth Amendment applied to Mr. Reed because he was functioning as a government actor. He also argues that Sergeant Van Curen performed a warrantless arrest without probable cause, and that the statements he made in the presence of Mr. Reed and Sergeant Van Curen should be suppressed.

"When reviewing the denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in the light most favorable to the government." *United States v. Maestas*, 639 F.3d 1032, 1035 (10th Cir. 2011) (quotations omitted). "The ultimate determination of reasonableness is a question of law reviewable de novo." *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008) (quotations omitted).

## A. *Mr. Reed's Status—Government Actor or Private Citizen?*

We first address the relevance of Mr. Reed's conduct to the Fourth Amendment violations alleged in Mr. Cintron's motions to suppress. We do so because, if Mr. Reed was acting in a private capacity and not as a state actor, his conduct is not relevant to our Fourth Amendment analysis.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Its protections do not apply against "private individual[s] not acting as . . . agent[s] of the Government or with the participation or knowledge of any governmental official." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (quotations omitted); *United States v. Souza*, 223 F.3d 1197, 1201 (10th Cir. 2000) ("The Fourth Amendment protects citizens against unreasonable searches and seizures by *government actors*." (emphasis added)). "When a private individual conducts a search not acting as, or in concert with, a government agent, the Fourth amendment is not implicated, no matter how unreasonable the search." *United States v. Poe*, 556 F.3d 1113, 1123 (10th Cir. 2009).

-6-

Determining when an individual is acting as a private citizen or a government actor can be difficult, including when the individual is an off-duty police officer working as a security guard. *See Chapman v. Higbee Co.*, 256 F.3d 416, 426 (6th Cir. 2001) (explaining that it is difficult to determine whether a private individual is a state actor and that it is "particularly [difficult] in the area of off-duty police officers acting as security guards"), *vacated*, *Chapman v. Higbee Co.*, 270 F.3d 297 (6th Cir. 2001).

The Government urges us to apply a test from *United States v. Souza*, 223 F.3d 1197 (10th Cir. 2009). We have used the *Souza* test to decide whether a search by a private individual constitutes government action within the meaning of the Fourth Amendment. Under that test, we ask "1) whether the government knew of and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Id.* at 1201 (quotations omitted).

We are not convinced that the *Souza* test fits well here. Instead of determining whether a private citizen's conduct constitutes government action, this case raises the issue of whether a part-time police reserve officer working off-duty as a private security guard has acted as a government actor or as a private citizen.

We think *David v. City & County of Denver*, 101 F.3d 1344 (10th Cir. 1996), a 28 U.S.C. § 1983 suit in which we considered whether an off-duty police officer was a state actor, provides better direction. In *David*, we explained that such a determination "rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the

-7-

act, or whether or not the officer acts in accordance with his or her duty." *Id.* at 1353. "Instead [we] must examine the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Id*. (quotations omitted).

Rather than articulating a standard in *David*, we recognized key factors that other circuits have considered. "According to the First Circuit, 'the key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law,'" *id.* (quoting *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995)), and "[f]or the Seventh Circuit, the fundamental question is 'whether the officer's actions related in some way to the performance of a police duty.'" *Id.* (quoting *Gibson v. City of Chicago*, 910 F.2d 1510, 1517 (7th Cir. 1990)).

As in *David*, we need not articulate a standard here. Nor do we need to decide whether to follow the analyses from our § 1983 cases or the standard from *Souza*. Based on the facts of this case, under *David* or *Souza*, Mr. Reed acted in his private capacity when he searched and detained Mr. Cintron.

The OK Corral Club, not the Boley Police Department, hired and paid Mr. Reed for his security guard work at the club. Not all security team members were off-duty police officers. As for the members of OK Corral's security staff who were off-duty police officers, the OK Corral Club hired them and did not rely on official assistance from the police department. *See Traver v. Meshriy*, 627 F.2d 934, 938 (9th Cir. 1980) (holding that off-duty police officer working as security teller at a bank was a state actor

-8-

when that position was part of a "secondary hiring" program and the security teller's "primary duty was to the [police] department, not to the bank").

Mr. Reed was not wearing his police uniform, did not have his badge, and never identified himself as a police officer. *See Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1429-30 (10th Cir. 1984) (holding that off-duty police officer working as a store security guard was acting under color of state law when he flashed his badge, identified himself as a police officer, and arrested the alleged shoplifter on the spot), *vacated on other grounds*, *City of Lawton, Okla. v. Lusby*, 474 U.S. 805 (1985).

At the suppression hearing, Mr. Reed explained that he was working to further the interests of the OK Corral Club, not those of the police department. *See Poe*, 556 F.3d at 1124 (explaining that bounty hunters were not state actors when they "primarily intended to further their own ends . . . rather than to assist state officials" and had "legitimate, independent motivation to conduct the search" (quotations omitted)). Mr. Cintron's counsel asked Mr. Reed: "You have another interest . . . because you enforce the laws, right?" ROA, Vol. 2, at 34. Mr. Reed responded: "Well, yeah, but I don't [enforce the laws] there. I just . . . protect and keep the staff and the property safe over there. It's not a matter of me really enforcing the laws over there. We just look out for the safety over there." *Id.* at 34-35. He also explained that had he been acting as a police officer, he would have acted differently and would have "put [Mr. Cintron] on the ground." *Id.* at 32.

Finally, Mr. Reed did not formally arrest Mr. Cintron. Instead, Mr. Reed's supervisor called the Oklahoma Police Department to "sort it out." *Id.* at 35; *see Poe*, 556 F.3d at 1124 (holding bounty hunters were not state actors when police did not become involved until after the bounty hunters discovered evidence). As soon as Sergeant Van Curen arrived, he took over. He applied his own handcuffs, performed the records check, and told Mr. Cintron that he was under arrest.

Based on his conduct, appearance, and relationship with the OK Corral Club and the Boley Police Department, Mr. Reed was acting in his private capacity as a security guard, and his actions did not constitute government action for the purposes of the Fourth Amendment.[2]

## B. *The Motions to Suppress*

---

[2] Mr. Cintron argues that because Mr. Reed was certified by the Council on Law Enforcement Education and Training ("CLEET") as a basic police officer, he was necessarily acting as a police officer. But such state certification does not require us to conclude he was acting as a police officer. Instead, it is well settled that such "acts of officers in the ambit of their personal pursuits" are not "under color of [state] law." *Screws v. United States*, 325 U.S. 91, 111 (1945); *see also Haines v. Fisher*, 82 F.3d 1503, 1508 (10th Cir. 1996) (holding that on-duty police officers did not act under color of state law when they played a practical joke by staging a robbery).

Mr. Cintron also argues that if Mr. Reed was not acting as a police officer, his actions violated numerous Oklahoma laws, such as assault, battery, and openly carrying a firearm. But these alleged violations of Oklahoma law do not affect our determination of whether Mr. Reed was acting as a government actor for the purposes of the Fourth Amendment or our consideration of the denial of his motions to suppress.

Mr. Cintron submitted two motions to suppress to the district court. The first sought generally to suppress the evidence against him, and the second sought to suppress inculpatory statements he had made in the presence of Mr. Reed and Sergeant Van Curen.

1. *The Evidence*

In his motion to suppress the evidence, Mr. Cintron failed to identify the evidence that he sought to suppress. In the motion's introduction, he noted only generally that he wished to "suppress[] the evidence against him in [the] matter." Supp. ROA, Vol. 1, at 10. Other than Mr. Cintron's inculpatory statements, the only relevant evidence that we can discern is the firearm and the results of Sergeant Van Curen's records check—Mr. Cintron's status as a felon.

Because Mr. Reed discovered the firearm and the Fourth Amendment did not apply to his conduct, the firearm was not and should not have been suppressed. Thus, we are left with the results of Sergeant Van Curen's records check.

Although Mr. Cintron does little more in his appellate briefs than he did in the district court to identify the evidence that he wished to suppress, he states in both his opening and reply briefs that "[t]he arrest and the subsequent background information which would not have been obtained but for the illegal arrest should have been and now

should be suppressed." Aplt. Br. at 32-33; Aplt. Reply Br. at 14. Thus, we assume that

he is arguing that his status as a felon should be suppressed.[3]

Mr. Cintron does not argue that Sergeant Van Curen lacked reasonable suspicion

to detain him. Instead, he argues that he was subject to an unjustified warrantless arrest

rather than an investigatory detention.[4]

We need not decide whether Sergeant Van Curen was justified in his actions

---

[3] We question whether Mr. Cintron raised this argument at the district court. Absent good cause, we do not consider arguments not raised in the suppression proceedings at the district court and consider such arguments waived. *See United States v. Burke*, 633 F.3d 984, 987-88 (10th Cir.), *cert. denied*, 131 S. Ct. 2130 (2011).

The only statement more specific than his introductory statement that he sought to suppress "the evidence against him," appears in the conclusion of his motion. There, Mr. Cintron "pray[ed] that [the] [c]ourt grant his motion and suppress the *physical evidence illegally seized from his person*." Supp. ROA, Vol. 1, at 21 (emphasis added). Evidence of his felon status was not physical evidence illegally seized from his person. Further, his motion at the district court never explained how Sergeant Van Curen's actions led to the discovery of any suppressible evidence.

Even if Mr. Cintron preserved an argument regarding evidence of his felon status, the results of Sergeant Van Curen's records check should not be suppressed.

[4] Mr. Cintron states:

Certainly the facts reflect without any doubt that [Mr. Cintron] was arrested prior to the arrival of [Sergeant] Van Curen. The fact that [Sergeant] Van Curen simply swapped out the handcuffs and placed [Mr. Cintron] in the back of the police car indicates his assumption of the arrest status. No reasonable person could argue that this was in any manner consensual or merely investigatory.

Aplt. Br. at 28.

because the results of his records check are subject to the inevitable discovery doctrine.[5]

"Under the inevitable discovery doctrine, even if the initial search and arrest was unlawful, the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means." *United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2003) (quotations omitted). "The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." *Id.* (quotations omitted). "We consider demonstrated historical facts, not speculative elements." *Id.* (quotations omitted).

Sergeant Van Curen would have discovered Mr. Cintron's criminal history regardless of whether he handcuffed him and placed him in the back of his police car. Sergeant Van Curen testified at the suppression hearing that he performed the records check to determine whether Mr. Cintron had a permit for his firearm. He explained that "[a]t the point that [I] switched out [the] handcuffs . . . I was still investigating whether . . . [Mr. Cintron] [had] a . . . permit [for his firearm] and hadn't checked his name yet." ROA, Vol. 2, at 42-43.

This statement indicates that Sergeant Van Curen would have conducted the records check and discovered Mr. Cintron's status as a felon even if he had not switched

---

[5]Although the district court did not reach this issue, "we may affirm on any grounds supported by the record." *United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2011) (quotations omitted).

-13-

the handcuffs and placed Mr. Cintron in the back of his police car. Such actions were unrelated to the records check. Therefore, the results of Sergeant Van Curen's records check were not and should not be suppressed.

## 2. *The Statements*

Mr. Cintron also argues that the district court erred in denying his motion to suppress statements that he made in the presence of Mr. Reed and Sergeant Van Curen.[6] He contends that he made these statements during a custodial interrogation and that "[t]he coercive atmosphere was unbroken and continuous." Aplt. Br. at 34. We disagree because, as the district court explained, Mr. Reed was not a government actor and there was no interrogation.

"[T]he Fifth Amendment['s] privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *United States v. Cook*, 599 F.3d 1208, 1213 (10th Cir.), *cert. denied*, 131 S. Ct. 331 (2010). "*Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (quotations omitted). Like

---

[6]Mr. Cintron never identifies in his appellate briefs or in his materials at the district court the specific statements that he wished to suppress. We assume that he wished to suppress the statements that he made in the presence of Mr. Reed and then again in the presence of Sergeant Van Curen—admitting that he possessed the firearm and explaining his reason for doing so.

the Fourth Amendment, the Fifth Amendment "provides no protection against private actions by private individuals." *Smith v. Kitchen*, 156 F.3d 1025, 1028 (10th Cir. 1997).

Because Mr. Reed was not acting as a government actor on the night of April 18, 2011, we need only consider the statements made in the presence of Sergeant Van Curen. The Government concedes that Mr. Cintron was "in custody" when he made the alleged statements. Thus, we consider only whether Mr. Cintron was subject to an "interrogation."

"[I]nterrogation encompasses not only questioning but 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Rambo*, 365 F.3d 906, 909 (10th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). There was no interrogation. According to Mr. Reed, while he was explaining the situation to Sergeant Van Curen immediately following the latter's arrival at the OK Corral Club, Mr. Cintron "jumped in on the conversation," ROA, Vol. 2, at 24. Sergeant Van Curen also testified that Mr. Cintron "voluntarily contribut[ed] to [the] conversation." *Id.* at 38. Neither Sergeant Van Curen, Mr. Reed, nor any of the other security guards had directed any questions to Mr. Cintron at that time or intended to include him in their conversation. Therefore, Mr. Cintron did not make any of the inculpatory statements in response to a custodial interrogation by a government actor, and his statements should not be suppressed.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Mr. Cintron's motions to suppress.


ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge

-16-