**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 11, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES of AMERICA,

  Plaintiff - Appellant,

v.

  No. 04-2194

GUSTAVO OLIVARES-RANGEL,

  Defendant - Appellee.

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-04-528 RB)**

---

Mark A. Saltman, Special Assistant United States Attorney, Las Cruces, New Mexico (David C. Iglesias, United States Attorney, District of New Mexico, with him on the briefs), for Plaintiff-Appellant.

Barbara A. Mandel, Assistant Federal Public Defender, Las Cruces, New Mexico, for Defendant-Appellee.

---

Before **LUCERO**, **BALDOCK**, and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

  This case involves a prosecution under 8 U.S.C. § 1326, which makes it a

crime to be present in the United States illegally after having been previously

deported. Here, two border patrol agents, acting on an anonymous tip, stopped Gustavo Olivares-Rangel ("Defendant") as he was leaving a trailer park and questioned him about his identity and citizenship. After Defendant admitted to being an illegal alien, he was arrested and taken to a border patrol station where he was questioned further and fingerprinted. Based on his fingerprints, the agents were able to connect Defendant to an INS file that indicated he had a previous felony conviction. This increased the maximum penalty for Defendant's § 1326 offense to a sentence of 20 years.

Defendant argued that his seizure was not based upon probable cause or reasonable suspicion and moved to suppress all the evidence in the case as fruit of the poisonous tree. The district court agreed and excluded Defendant's statements, his fingerprints, and the contents of his INS file. On appeal, the Government does not contest the illegality of the seizure. Rather, it argues primarily that the Supreme Court's decision in Immigration and Naturalization Service v. Lopez-Mendoza, 468 U.S. 1032 (1984), forecloses the possibility of suppressing any evidence of identity in a criminal case.

We conclude that Lopez-Mendoza does not prevent the suppression of all identity-related evidence. Rather, Lopez-Mendoza merely reiterates the long-standing rule that a defendant may not challenge a court's jurisdiction over him or her based on an illegal arrest. Ultimately, we conclude that evidence of Defendant's oral statements were correctly suppressed. However, we remand for

further factfinding on the suppression of Defendant's fingerprints and his INS file.

Having jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1291, we AFFIRM in part, REVERSE in part, and REMAND.

## BACKGROUND

### I. Factual background

Sometime during January 2004, agents Luis Armendariz and Mark Marshall of the United States Border Patrol apprehended an illegal alien ("the informant") in Berino, New Mexico. On the way to the border patrol station, the informant told one of the agents that he knew of several other illegal aliens living in a trailer in Vado, New Mexico, who were possibly burglarizing homes in the area. The agents took a detour to a trailer park in Vado, and the informant pointed out the trailer where the alleged criminals lived.

Over the next three weeks, Agents Armendariz and Marshall made numerous visits to the trailer park in Vado looking for the suspects, but did not discover anyone until February 2, 2004. At about 10:00 a.m. on that date, the agents approached the trailer and saw a green pickup truck exiting the narrow driveway. The agents intercepted the vehicle, thereby blocking its exit from the trailer park. Once the vehicles were bumper-to-bumper, Agent Armendariz

immediately recognized the passenger of the pickup as Defendant, an immigrant

he had arrested a month or two before for being in the United States illegally.[1]

Agent Armendariz questioned the occupants of the pickup (including

Defendant) about their citizenship prior to giving any warnings pursuant to

Miranda v. Arizona, 384 U.S. 436, 444 (1966).  According to Agent Armendariz,

Defendant admitted he was a Mexican citizen and in the United States illegally.

Defendant was then arrested and taken to the border patrol station where he was

fingerprinted and asked about his biographical information.  Based on this

evidence, Agent Armendariz connected Defendant with his immigration record

and prior criminal record (also known as his "A-file" or "alien file"), which

indicated that he was a previously deported alien.  At this point, Agent

Armendariz first read Defendant his Miranda rights and sent him to the Otero

County Jail.

---

[1] We do not disagree with the dissent's statement that Agent Armendariz's recognition of Defendant is not suppressible because Defendant "has no reasonable expectation of privacy in his visual appearance when exposed to the public eye."  Dissent at 6.  However, the Government has waived this issue by failing to argue it because Fourth Amendment standing is not jurisdictional.  See United States v. Dewitt, 946 F.2d 1497, 1499-1500 (10th Cir. 1991) ("[T]he issue of fourth amendment standing could be waived if the government has 'failed to raise it in a timely fashion during the litigation.'") (quoting Steagald v. United States, 451 U.S. 204, 209 (1981) (alteration omitted)).  Additionally, whether Border Patrol's recognition of Defendant as a previously deported illegal alien provided probable cause for Defendant's arrest is irrelevant because, as later discussion explains, the Government conceded on appeal that Defendant's arrest in this case was unlawful.

## II.   Procedural background

On March 4, 2004, a federal grand jury issued an indictment charging Defendant with illegally being present within the United States after being previously deported, pursuant to 8 U.S.C. § 1326(a) (2000). Because Defendant had been previously convicted of an aggravated felony, he was also charged under 8 U.S.C. § 1326(b), which made him eligible for a maximum sentence of 20 years' imprisonment.

Defendant filed a motion to suppress "any physical evidence and statements obtained as a result of the unlawful seizure and interrogation of [Defendant] on February 2, 2004." Defendant argued that the seizure and interrogation were conducted in violation of his Fourth and Fifth Amendment rights. On June 8, 2004, the district court held a suppression hearing, during which it took testimony from Agents Armendariz and Marshall as well as Sofia Delgado, a witness to the events of February 2, 2004.

The district court granted Defendant's motion, suppressing "all statements and fingerprints seized from [Defendant], as well as the immigration and criminal records located using that evidence of identity." In its written order, the court made a number of conclusions of law which are relevant to this appeal.

First, the court concluded that both "the stop _and_ subsequent arrest" of Defendant at the trailer park violated the Fourth Amendment. The Government did _not_ directly dispute this conclusion, nor did it argue in either its opening or

reply brief that Border Patrol had probable cause to arrest Defendant. To the contrary, the Government expressly acknowledged in its briefing that it was "not challeng[ing] the district court's factual findings and conclusions that Border Patrol violated [Defendant]'s Fourth Amendment right[s]." Additionally, at oral argument, the Government explicitly confirmed that it was appealing only the legal question of whether Defendant's identity-related evidence could be suppressed as fruits of a poisonous tree and was not appealing the district court's conclusion that Border Patrol lacked probable cause to arrest Defendant.[2] Accordingly, the Government waived the issue of probable cause by failing to raise it, see State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994), and conceded for purposes of this appeal that Defendant was unlawfully arrested.[3]

---

[2] At argument, the Government began to argue that Border Patrol had probable cause for the arrest because Agent Armendariz recognized Olivares as an illegal alien. Judge Ebel stopped the Government's attorney to ask:

> But you're not appealing that. The district court said there was no probable cause. And as I understand it you don't appeal that. You appeal only the pure legal question that even without probable cause Lopez-Mendoza does not allow you to suppress. Isn't that correct?"

The attorney responded, "That's correct, Your Honor." Judge Ebel pushed the issue once more and stated, "That is what I asked you at beginning of argument. I wanted to know whether we needed to get into all this probable cause . . . I thought you told me no." Again, the attorney responded, "That's correct, Your Honor."

[3] Our disagreement with the dissent can be expressed very simply and
(continued...)

Second, the court determined that the fingerprints taken at the border patrol station and the statements that Defendant made at that time must be suppressed as "fruit of the poisonous tree." In doing so, the court applied the factors set forth in Brown v. Illinois, 422 U.S. 590, 603-04 (1975). Specifically, with regard to Defendant's oral statements, the court noted that Miranda warnings had not been given when Defendant incriminated himself.[4]

Third, the court concluded that the Government had not met its burden of proving that the evidence in question would have been inevitably discovered in the absence of the Fourth Amendment violation. See United States v. White, 326 F.3d 1135, 1138 (10th Cir. 2003). The Government has not appealed this point.

---

[3](...continued)
fundamentally: even if the record could factually support a conclusion that probable cause for Defendant's arrest existed, as the dissent claims, the Government has conceded that Defendant's detention and arrest were unlawful. Contrary to the dissent's approach, we believe that we must therefore decide this appeal within the framework in which it was presented to us.

[4] The district court did not expressly conclude that Miranda or the Fifth Amendment had been violated. Rather, Miranda was referenced only to the extent that it indicates an attenuation of the taint. See Brown, 422 U.S. at 603 (noting that issuance of Miranda warnings are an important, but not dispositive, factor in attenuating the taint between an illegal seizure and a subsequent statement).

In his brief, Defendant argues his statements must be suppressed not only on Fourth Amendment grounds, but also because his Fifth Amendment rights were violated when the officers questioned him without first giving Miranda warnings. Because we ultimately conclude that suppression of Defendant's statements was appropriate under the Fourth Amendment, we do not reach this question.

- 7 -

Fourth, the court considered and rejected the very argument that the Government makes on appeal here, that the "body" or "identity" of a defendant is never itself suppressible as fruit of an unlawful arrest and thus no evidence pertaining to identity may be suppressible. See Lopez-Mendoza, 468 U.S. at 1039. Concluding that the Supreme Court was speaking about jurisdictional challenges under the Fourth Amendment as opposed to evidentiary challenges to tainted identity evidence, the district court held Lopez-Mendoza was inapplicable and that the case did not prohibit suppression of the statements and fingerprints.

Finally, the court turned to the contents of Defendant's A-file. Since it had concluded that all of the evidence leading Agent Armendariz to discover the existence of the file should be suppressed, the court also suppressed the contents of the A-file, which included Defendant's criminal and immigration records.

To summarize, the district court excluded four pieces of evidence: (1) Defendant's initial statement at the time of his arrest; (2) the fingerprint evidence taken at the border patrol station; (3) the contents of Defendant's A-file; and (4) Defendant's oral statements regarding biographical information made at the border patrol station. The instant appeal by the government followed.

## DISCUSSION

### I.    Standard of review

A district court's decision to suppress evidence under the Fourth Amendment is a question of law that we review de novo.  United States v. Evans, 937 F.2d 1534, 1536-37 (10th Cir. 1991).

### II.    Issue on appeal

This appeal raises the question of whether evidence of a defendant's identity (including statements, fingerprints, and an A-file) may ever be suppressed as the "fruit" of an unlawful arrest.  Before examining the merits of the Government's argument, it is helpful first to place this issue in its proper Fourth Amendment context.

The ordinary remedy in a criminal case for violation of the Fourth Amendment is suppression of any evidence obtained during the illegal police conduct.  See Mapp v. Ohio, 367 U.S. 643, 648 (1961).  In addition, a defendant may also suppress any other evidence deemed to be "fruit of the poisonous tree," (i.e., evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence. Wong Sun v. United States, 371 U.S. 471, 485 (1963); United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000).

Once the defendant meets this burden, the Government may still avoid suppression by proving that the contested evidence is not fruit of the poisonous

tree.  <u>Nava-Ramirez</u>, 210 F.3d at 1131.  According to the Supreme Court, the overriding issue in "fruits" cases is

> whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

<u>Wong Sun</u>, 371 U.S. at 488 (quotations and citation omitted).  The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct.  <u>Id.</u>

Although the Government argued inevitable discovery and attenuation of the taint below, its does not reassert these doctrines on appeal.  Instead, its primary position on appeal is that the evidence of identity of a defendant is never suppressible as the fruit of an unlawful arrest.  Accordingly, we address that issue first.

**III.   Suppressability of identity-related evidence as fruit**

In arguing that identity evidence should never be suppressible as fruit of the poisonous tree, the Government relies almost exclusively on a single sentence in <u>Lopez-Mendoza</u>:

> The "body" or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.

468 U.S. at 1039.[5]  Here, of course, the district court suppressed statements and fingerprints along with files located using such "evidence of identity."  At first blush, the above-quoted language in Lopez-Mendoza appears to control the case at bar; however, a closer analysis indicates that the issue is more complex than the Government presents it to be.

## A.    Lopez-Mendoza and related lower-court cases

In Lopez-Mendoza, the Court reviewed two civil deportation proceedings that took place following unlawful arrests.  468 U.S. at 1034-35.  In the first case, respondent Adan Lopez-Mendoza ("Lopez") argued that the immigration court did not have personal jurisdiction over him by virtue of the fact that his arrest had been unlawful; he did not object to the specific evidence offered against him: namely, his oral and written admissions to law enforcement officers concerning his identity and citizenship.  Id. at 1035.  The immigration court held that the legality of Lopez's arrest was irrelevant to its jurisdiction and overruled the objection.  Id.

In the second case, respondent Elias Sandoval-Sanchez ("Sandoval") argued that incriminating statements regarding his nationality and identity were fruit of an illegal arrest and should be suppressed.  Id. at 1037.  Ultimately, the lower courts held that Sandoval's detention violated the Fourth Amendment and

---

[5]  For convenience, the above-quoted passage will be referred to in this opinion as the "identity" or "disputed" language from Lopez-Mendoza.

held that the statements could not be used against him in his civil deportation proceedings. Id.

Thus, by the time the cases came to the Supreme Court, two questions readily presented themselves for review: (1) whether an illegal arrest deprived the immigration court of jurisdiction over the respondent's "person"; and (2) whether the exclusionary rule, which is typically a remedy in criminal cases, would be extended to apply to civil deportation proceedings.

Dealing with the Lopez claim first, the Court held that the immigration court retained jurisdiction because "[t]he mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding." Id. at 1040 (quotation omitted). It was in this context in which the Court noted that the "body" or identity of a defendant is never suppressible as fruit of an unlawful arrest. Id. at 1039-40 (citing, inter alia, Gerstein v. Pugh, 420 U.S. 103, 119 (1975) and Frisbie v. Collins, 342 U.S. 519, 522 (1952)). Based on the cases the Court cited, it appears that the majority was referencing the long-standing rule, known as the Ker-Frisbie doctrine, that illegal police activity affects only the admissibility of evidence; it does not affect the jurisdiction of the trial court or otherwise serve as a basis for dismissing the prosecution. See Ker v. Illinois, 119 U.S. 436, 443 (1886) (holding that the constitution does not prevent criminal jurisdiction over a defendant who was forcibly abducted from another country); Frisbie, 342 U.S. at 522 ("This Court has never departed from the rule announced in [Ker] that the

power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'"); see also Gerstein, 420 U.S. at 119 (reiterating the Court's "established rule" that illegal arrest or detention does not void a subsequent conviction).

The Lopez-Mendoza Court then turned its attention to Sandoval's claim, which was not directed to the jurisdiction of the immigration court, but rather to the admissibility of statements regarding Sandoval's citizenship and identity that were made following the illegal arrest. 468 U.S. at 1040. The Court first undertook to decide if the exclusionary rule itself extended to non-criminal, civil deportation proceedings. Id. at 1041. After applying the factors in United States v. Janis, 428 U.S. 433 (1976), the Court held that the exclusionary deterrent should not apply to civil deportation proceedings. Lopez-Mendoza, 468 U.S. at 1050.

The language in Lopez-Mendoza concerning the suppressibility of a defendant's "body" or "identity" has been the cause of much consideration by the lower courts. The Ninth Circuit has relied upon this language to justify denying suppression of either a defendant's identity or his governmental files in prosecutions brought under 8 U.S.C. § 1326. See United States v. Guzman-Bruno, 27 F.3d 420, 422 (9th Cir. 1994). The Eighth Circuit, on the other hand, upheld the suppression of physical fingerprint evidence obtained after an illegal arrest, but not in the context of a routine booking, and further concluded that the

"identity" language in Lopez-Mendoza referred only to jurisdictional challenges and did not foreclose suppression of all identity-related evidence. United States v. Guevara-Martinez, 262 F.3d 751, 754 (8th Cir. 2001). We find the Eighth Circuit's analysis persuasive.

## B. Analysis

We do not read Lopez-Mendoza as exempting from the "fruits" doctrine all evidence that tends to show a defendant's identity. Rather, the Supreme Court's statement that the "body" or identity of a defendant are "never suppressible" applies only to cases in which the defendant challenges the jurisdiction of the court over him or her based upon the unconstitutional arrest, not to cases in which the defendant only challenges the admissibility of the identity-related evidence. This much is evident simply from looking at the cases the Court cites in support of its proposition. See Frisbie, 342 U.S. at 522; Gerstein, 420 U.S. at 119. As the Eighth Circuit noted in Guevara-Martinez:

> These cases [relied upon by the Court in Lopez-Mendoza] deal with jurisdiction over the person, not evidence of the defendant's identity illegally obtained. The language in Lopez-Mendoza should only be interpreted to mean that a defendant may be brought before a court on a civil or criminal matter even if the arrest was unlawful.

262 F.3d at 754.

The limited scope of Lopez-Mendoza is also clear from analyzing the two separate proceedings in that case. Lopez argued only that the immigration court lacked personal jurisdiction over him due to the illegal arrest. 468 U.S. at 1035-

- 14 -

He did not challenge the admissibility of his statements to officers disclosing his identity.  See id.  Sandoval, on the other hand, specifically raised an evidentiary challenge to identity-related statements he sought suppressed.  Id. at 1037.  If the "identity" language (which is first mentioned in connection with Lopez's jurisdictional challenge) applied with equal force to Sandoval's evidentiary challenge, there would have been no need for the Court to dispose of Sandoval's case separately.  See id. at 1040-41 (referring to the "general [exclusionary] rule [to be applied] in a criminal proceeding" in discussing Sandoval's evidentiary challenge, without distinguishing between identity-related evidence and other types of evidence).

Seeking to suppress one's very identity and body from a criminal proceeding merely because of an unconstitutional arrest is the sort of jurisdictional challenge foreclosed by Lopez-Mendoza.  The language in Lopez-Mendoza merely says that the defendant cannot suppress the entire issue of his identity.  A defendant may still seek suppression of specific pieces of evidence (such as, say, fingerprints or statements) under the ordinary rules announced in Mapp and Wong Sun.  A broader reading of Lopez-Mendoza would give the police carte blanche powers to engage in any manner of unconstitutional conduct so long as their purpose was limited to establishing a defendant's identity.  We do not believe the Supreme Court intended Lopez-Mendoza to be given such a reading.

Furthermore, specifically with regard to fingerprint evidence, the Supreme Court has made it clear on two occasions that fingerprint evidence (which is undeniably identity evidence) obtained after an illegal arrest may be suppressed under the exclusionary rule if obtaining the fingerprints was the objective of the illegal arrest. Davis v. Mississippi, 394 U.S. 721, 727 (1969); Hayes v. Florida, 470 U.S. 811, 815 (1985). Because Lopez-Mendoza did not expressly overrule Hayes and Davis, we are bound to apply those earlier cases. See Agostini v. Felton, 521 U.S. 203, 237 (1997) (warning that the circuit courts should not conclude that more recent Supreme Court cases have, by implication, overruled earlier precedents).

Our conclusion from Lopez-Mendoza, Davis, and Hayes, considered together, is that the "identity" language in Lopez-Mendoza refers only to jurisdiction over a defendant and it does not apply to evidentiary issues pertaining to the admissibility of evidence obtained as a result of an illegal arrest and challenged in a criminal proceeding. Instead, we utilize the normal and generally applicable Fourth Amendment exclusionary rule to determine whether challenged identity-related evidence should be excluded under the circumstances present in the particular case.

## IV. Suppression of Defendant's statement, fingerprints, and A-file

Having concluded that Lopez-Mendoza refers only to jurisdictional challenges, and not to challenges to the admissibility of identity-related evidence,

we must now determine whether the general exclusionary rule requires suppression of Defendant's statements, his fingerprints, and his A-file under the circumstances present here, see Guevara-Martinez, 262 F.3d at 754-55; however, we must do so only if the Government preserved for appeal its argument against suppression under the general exclusionary rule.

## A.    Defendant's statements

According to the record, Defendant made statements concerning his identity and nationality directly after his illegal arrest and again at the border patrol station.  The district court concluded, after applying the factors in Brown, 422 U.S. 603-04, that the taint from Defendant's illegal arrest had not become sufficiently attenuated so as to permit admission of Defendant's incriminating statements.  On appeal, the Government does not re-assert its attenuation-of-the-taint argument with regard to these statements.  The Government's opening brief does not even mention the Brown factors or contend that the district court misapplied them.  Rather, the Government rests its challenge to the suppression of Defendant's statements solely on the broader proposition that Lopez-Mendoza prevents a defendant from ever seeking suppression of evidence of his identity. That proposition having been rejected for the reasons stated above, we decline to disturb the conclusion of the district court that the taint from the illegal arrest was not sufficiently attenuated by the time Defendant spoke to law enforcement

- 17 -

officers so as to permit admission of the statements concerning identity and nationality.

## B.    Fingerprints

On the issue of the exclusion of fingerprints, the Government does expand its argument beyond its interpretation of Lopez-Mendoza.  It also argues that if Lopez-Mendoza does not place identity evidence off limits from suppression, then under the ordinary application of the exclusionary rule Defendant's fingerprints should not be suppressed because this case is distinguishable from Davis and Hayes.  We therefore review whether Defendant's fingerprints constitute fruit of the poisonous tree that must be excluded under the facts of this case.

Based on Defendant's now-suppressed statement of identity, Agent Armendariz took Defendant to the border patrol station where he was fingerprinted.  Thus, there is a factual nexus between the illegal conduct and the evidence in question (fingerprints).  Nevertheless, we distinguish between fingerprints that are obtained as a result of an unconstitutional governmental investigation and fingerprint evidence that is instead obtained merely as part of a routine booking procedure.  In doing so, we hold that fingerprints administratively taken in conjunction with an arrest for the purpose of simply ascertaining or confirming the identity of the person arrested and routinely determining the criminal history and outstanding warrants of the person arrested are sufficiently unrelated to the unlawful arrest that they are not suppressible.

Ultimately, however, we reverse and remand on this issue because the factual record in this case is insufficient to determine whether Defendant's unconstitutional arrest was purposefully exploited in order to develop critical evidence of criminal conduct to be used against Defendant.

### 1. Routine booking procedures and the exclusionary rule

Certain routine administrative procedures, such as fingerprinting, photographing, and getting a proper name and address from the defendant, are incidental events accompanying an arrest that are necessary for orderly law enforcement and protection of individual rights. See 6 Wayne R. LaFave, Search and Seizure § 11.4(g), at 362 (4th ed. 2004) ("[F]ingerprinting, like photographing, is a rather standard booking procedure."). Fingerprinting ensures that the person who has been arrested is in fact the person law enforcement agents believe they have in custody. See Notes and Comments, Excluding From Evidence Fingerprints Taken After an Unlawful Arrest, 69 Yale L.J. 432, 438 n.30 (1959-60) ("In addition to establishing identity at the time of arrest, fingerprints are useful in aiding the apprehension of escaped prisoners, and in ascertaining whether the defendant has been previously convicted . . . .") (citing United States v. Kelly, 55 F.2d 67, 70 (2d Cir. 1932)); 3 LaFave, supra, § 5.3(c), at 168 ("Fingerprinting, as a routine part of the booking process, is justified by the legitimate interest of the government in knowing for an absolute certainty the identity of the person arrested, in knowing whether he is wanted elsewhere, and in

ensuring his identification in the event he flees prosecution . . . ."). It is therefore considered "elementary that a person in lawful custody may be required to submit to . . . fingerprinting as part of routine identification processes." Smith v. United States, 324 F.2d 879, 882 (D.C. Cir. 1963) (citations omitted). The government always has the right, and indeed the obligation, to know who it is that they hold in custody regardless of whether the arrest is later determined to be illegal.

In light of the underlying purpose of the exclusionary rule, it would make little sense to suppress fingerprint evidence obtained merely as part of a routine booking procedure, even where a judge subsequently rules that the arrest was illegal. The exclusionary rule "is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217 (1960); see also Excluding From Evidence, supra, 69 YALE. L.J. at 436 n.24 ("[T]he threat of exclusion will operate as intended only if an excludable piece of evidence is the target of the police activity, and if the police are previously aware of the rule and its threat to the success of their venture.").

A blanket rule excluding fingerprint evidence obtained after an illegal arrest would have neither a practical deterrence effect on unlawful arrests that were not made for the purpose of obtaining fingerprint evidence nor would it outweigh the substantial social costs of suppressing such evidence. See Penn. Bd.

of Probation and Parole v. Scott, 524 U.S. 357, 363 (1998) (directing that the exclusionary rule applies "only where its deterrence benefits outweigh its substantial social costs") (quotation omitted).  Accordingly, although Lopez-Mendoza does not automatically exempt all fingerprint evidence from application of the Wong Sun doctrine, application of that rule indicates that fingerprints taken as part of a routine booking procedure following an arrest later determined to be illegal ordinarily will not be poisoned fruit of an illegal arrest and should not be suppressed.[6]  See United States v. Garcia-Beltran, 389 F.3d 864, 868-69 (9th Cir. 2004) (holding that fingerprint evidence obtained as a result of an alien's illegal arrest need not be suppressed if the fingerprints were taken merely for purposes of

---

[6] We note that several courts have similarly found routine booking photographs not to be the fruit of an illegal arrest for the purposes of suppression. See United States v. Beckwith, 22 F. Supp. 2d 1270, 1291-1294 (D. Utah 1998) (chronicling cases and distinguishing between photographs taken for investigatory purposes and routine booking photographs); see also Robinson v. State, 452 A.2d 1291, 1299 (Md. Ct. Spec. App. 1982) ("In the absence of evidence . . . tending to show that [defendant]'s . . . arrest was not only illegal but was merely a pretext for a general exploratory search (as in Davis . . . ) or for gathering evidence in this case (as in United States v. Crews, [445 U.S. 463 (1980)]), a routine 'booking' photograph taken as a consequence of that arrest would not be suppressible as tainted fruit in this proceeding."); Commonwealth v. Manning, 693 N.E.2d 704, 708-09 (Mass. App. Ct. 1998) (refusing to suppress a defendant's photograph where "the purpose of the defendant's arrest was not to obtain evidence;" and "the taking of the defendant's photograph during the booking process was standard police procedure and bore no relation to the purpose or validity of the arrest") (citation omitted); People v. McInnis, 494 P.2d 690, 693 (Cal. 1972) (finding that a booking photograph, routinely made pursuant to an arrest, should not be suppressed because there was no evidence of exploitation or other improper government conduct).

identification such as during a routine booking procedure); <u>Guevara-Martinez</u>, 262 F.3d at 756 (suppressing fingerprint evidence where the government offered "no evidence that the fingerprints were obtained as a matter of course through routine booking procedures"); <u>see also</u> <u>Paulson v. State</u>, 257 So. 2d 303, 305 (Fla. Dist. Ct. App. 1972) (holding that fingerprints routinely taken after illegal arrest could be used in a subsequent prosecution for another crime).

This is not to say that fingerprint evidence taken after an illegal arrest, even as part of a routine booking procedure, is never suppressible. By focusing upon the purpose for an illegal arrest and subsequent fingerprinting in determining whether fingerprint evidence is tainted fruit, courts properly focus on effectuating the underlying policy of the exclusionary rule. This is how we read the Supreme Court's decisions in <u>Davis</u> and <u>Hayes</u>.

In <u>Davis</u> and <u>Hayes</u>, the Supreme Court held that when an illegal arrest was used as an investigatory devise to obtain fingerprints, the fingerprints were regarded as inadmissible fruit of an illegal detention. <u>Hayes</u>, 470 U.S. at 817-18; <u>Davis</u>, 394 U.S. at 727-28. However, both cases arose from illegal arrests made <u>for the purpose of obtaining fingerprints</u>.[7] In suppressing the fingerprint evidence, "the Court focused its attention squarely on the motive of the arresting

_____

[7] In <u>Davis</u>, the police obtained the defendant's fingerprints in an attempt to match them to prints found at the scene of a rape. 394 U.S. at 722-23. Likewise, in <u>Hayes</u> the police detained the defendant specifically to obtain and to compare his fingerprints to fingerprints found at a crime scene. 470 U.S. at 813-17.

officers to obtain fingerprints, and made it plain . . . that that motive rationalized its decision." United States v. Ortiz-Gonzalbo, 946 F. Supp. 287, 289 (S.D.N.Y. 1996), aff'd on other grounds, No. 97-1210, 1997 WL 829306 (2d Cir. Dec. 9, 1997) (unpublished). Specifically, in Davis, the majority held that "[d]etentions for the sole purpose of obtaining fingerprints are . . . subject to the constraints of the Fourth Amendment." 394 U.S. at 727 (emphasis added). Additionally, Justice Harlan in his concurring Davis opinion directed that the rule applied by the Davis majority must be limited to situations like the "'dragnet' procedures employed in th[at] case." 394 U.S. at 728 (Harlan, J., concurring). And Justice Brennan, the author of Davis, later stated in his concurring opinion in Hayes that Hayes and Davis were indistinguishable in that "a suspect may not be apprehended, detained and forced to accompany the police to another location to be fingerprinted without a warrant or probable cause." 470 U.S. at 818-19 (Brennan, J., concurring in the judgment).

We therefore do not interpret Davis or Hayes as directing that fingerprint evidence obtained as a result of any illegal arrest or detention is always fruit of a poisoned tree. Like a majority of other courts to interpret these cases, we read Davis and Hayes as requiring the suppression of fingerprint evidence only when the illegal arrest was for the purpose of obtaining fingerprints without a warrant or probable cause. See Garcia-Beltran, 389 F.3d at 867; Guevara-Martinez, 262 F.3d at 755; United States v. Jennings, 468 F.2d 111, 115 (9th Cir. 1972); see

also <u>Ortiz-Gonzalbo</u>, 946 F. Supp. at 288-89; <u>S.E.G. v. State</u>, 645 So. 2d 347, 348-49 (Ala. Crim. App. 1994); <u>Black v. State</u>, 383 So. 2d 295, 297 (Fla. Dist. Ct. App. 1980); <u>Paulson</u>, 257 So. 2d at 304; <u>Orum v. State</u>, 245 So. 2d 829, 830 (Ala. Crim. App. 1970).[8]  <u>But see</u> <u>United States v. Lyles</u>, 471 F.2d 1167, 1169 (5th Cir. 1972) ("If [an arrest is illegal], then the fingerprints taken from appellant pursuant to that arrest will be inadmissible . . . ."); <u>People v. Hernandez</u>, 11 Cal. App. 3d 481, 492-94 (Cal. Ct. App. 1970) ("Although the <u>Davis</u> case involved the indiscriminate roundup of numerous young men for the purpose of interrogation and fingerprinting, the high court gave no indication that its ruling was to be limited to those facts.").  Without a similar motive, neither <u>Davis</u> nor <u>Hayes</u> require suppression of fingerprint evidence obtained at every illegal arrest or detention.

The exclusionary rule applies "whenever evidence has been obtained 'by exploitation' of the primary illegality instead of 'by means sufficiently distinguishable to be purged of the primary taint.'  Evidence can be obtained 'by exploitation' of an unlawful detention even when the detention is not for the sole purpose of gathering evidence." <u>Guevara-Martinez</u>, 262 F.3d at 755 (quoting

---

[8]  We note that a leading Fourth Amendment treatise also advocates this reading of <u>Davis</u>.  <u>See</u> LaFave, <u>Search and Seizure</u>, § 11.4(g), at 362 ("In <u>Davis</u> the defendant was taken into custody <u>for the purpose of getting his fingerprints</u> for use in investigation of the crime which prompted the illegal arrest, and thus that case should not be read as declaring that fingerprints taken after an illegal arrest are always inadmissible.").

Wong Sun, 371 U.S. at 488). Accordingly, we hold that if an illegal arrest was purposefully exploited for the objective of obtaining fingerprints, then the fingerprint evidence must be suppressed.[9] See United States v. Flores-Sandoval, 422 F.3d 711, 715 (8th Cir. 2005) (affirming exclusion of fingerprint evidence where the defendant's fingerprints were taken "for the purpose of assisting the [United States Immigrations and Customs Enforcement] investigation") (quotations, alteration omitted); Garcia-Beltran, 389 F.3d at 868-69 (distinguishing between fingerprints taken for investigative purposes and those taken for identification purposes); Guevara-Martinez, 262 F.3d at 756 (distinguishing between fingerprints taken as part of a routine booking procedure and fingerprints taken for an INS-related purpose). Conversely, in the absence of evidence that the illegal arrest was purposefully exploited for investigatory objectives, fingerprints taken as part of a routine, booking procedure are not fruit of a poisonous tree.

---

[9] The dissent indicates that the benefit of suppressing fingerprint evidence obtained under these circumstances is slight because, as the "Supreme Court [has] observed, 'only a very small percentage of arrests of aliens are intended or expected to lead to criminal prosecutions.'" Dissent at 5 n.3 (quoting Lopez-Mendoza, 468 U.S. at 1043.) But the dissent's cost/benefit analysis fails to recognize that while the benefit of suppression may be slight, the cost of suppression is also slight. Our ruling suppresses evidence only where it can be demonstrated that the officer exploited an illegal arrest to obtain identity-related evidence for the purpose of pursuing criminal prosecution, not merely deportation proceedings, in which the exclusionary rule does not apply absent an egregious violation of the Fourth Amendment. See Lopez-Mendoza, 468 U.S. at 1050.

- 25 -

## 2.     Purpose for arresting and fingerprinting Defendant

Accordingly, in determining whether the fingerprint evidence in this case should be suppressed, we must determine the original purpose for arresting and later fingerprinting Defendant; that is, was Defendant fingerprinted merely as part of a routine booking or processing procedure or was the illegal arrest in part for the purpose of obtaining unauthorized fingerprints so Defendant could be connected to additional alleged illegal activity.  The precise circumstances under which Defendant was arrested and his fingerprints taken are not clear from the record.

The Government asserts on appeal that Defendant's fingerprints were taken while he was being processed for having illegally reentered the country; however, Agent Armendariz testified, and the district court found, only that "[Defendant]'s fingerprints were obtained at the Border Patrol Station and were used to connect [him] to his immigration record and prior criminal record."  Although it is clear how the fingerprints evidence was ultimately used, there is no evidence in the record before us to support the Government's assertion that the illegal arrest was not in part for the purpose of obtaining Defendant's fingerprints to link him to criminal activity.  Because, on the record before us, we do not know whether the illegal arrest was purposefully exploited for the objective of obtaining Defendant's fingerprints, we remand for an evidentiary hearing on this issue.  See Garcia-Beltran, 389 F.3d at 865 (remanding to the district court for factfinding in

a similar case challenging the admissibility of fingerprint evidence where the factual record regarding the fingerprinting of the defendant was incomplete).[10]

## C.    A-file

In its order below, the district court found that Defendant's fingerprints were used to connect him to his immigration record and prior criminal record, otherwise known as his A-file. The Government argues, in addition to its Lopez-Mendoza argument, that (1) Defendant lacked standing to challenge the introduction of the A-file; and (2) it is inappropriate to suppress this file because

---

[10] We agree with the dissent's conclusion that "[a]n ultimate resolution in favor of Defendant in this case will [not] exempt him from criminal prosecution," Dissent at 7 n.4, as this is precisely how we have interpreted Lopez-Mendoza. However, the dissent's subsequent discussion regarding the continuing nature of an immigration violation and the ability of the Government to require Defendant to submit to additional fingerprinting, as well as our response to it, is dicta, because that issue is not currently before us. Nevertheless, we caution that the assumption reached by the dissent is not necessarily true because the overriding issue in the fruit of the poisonous tree doctrine is whether evidence "has been come at by exploitation of th[e] [initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. at 488 (quotations and citation omitted). Accordingly, if the Government by exploitation of Defendant's (concededly) illegal arrest obtained Defendant's fingerprints and his A-file, the court could decide that even a second set of fingerprint evidence is not sufficiently attenuated to remove the taint and thus should be suppressed as poisonous fruit. See Davis, 394 U.S. at 725 n.4 (refusing to affirm a conviction despite the state's claim that the authorities could have used a second set of prints that were validly obtained, stating that "[t]he important thing is that those administering criminal law understand that they must [obtain evidence in a wholly proper way]."); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.") (emphasis added).

its contents were not developed as the result of any illegal activity, but rather the file was compiled prior to, and independently of, the illegal seizure of Defendant. The Government's challenge thus requires us to determine whether independent government records must be suppressed as fruits of the poisonous tree if the illegal arrest brings to the attention of authorities the fact that an individual is present in the United States and a subsequent check of independently created and maintained records reveals the individual's immigration and/or prior criminal record.

### 1. Standing to challenge fruits of the poisonous tree

While the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding the Fourth Amendment violation which constitutes the poisonous tree, see United States v. Salvucci, 448 U.S. 83, 85 (1980), the law imposes no separate standing requirement regarding the evidence which constitutes the fruit of that poisonous tree. In Wong Sun, the seminal case defining the fruit of the poisonous tree doctrine, the defendant, James Wah Toy, moved to suppress, inter alia, drugs found at the house of his co-defendant, Johnny Yee. 371 U.S. at 487-88. Toy had standing to object to admission of the drugs at his trial because of the alleged violation of his Fourth Amendment rights; in that case, the unlawful arrest of Toy. See id. at 484. The Supreme Court suppressed Toy's statements to the officers, including the statement that he had no drugs but that Yee did, as fruit of the illegal arrest. Id. at 486-87. The

Supreme Court ultimately held that Toy was also entitled to suppression of the drugs found at Yee's house because "it [was] clear that the narcotics were 'come at by the exploitation of [Toy's statement]' and hence that [the drugs] may not be used against Toy." Id. at 488. Thus, regardless of the fact that Toy maintained no reasonable expectation of privacy in the drugs at Yee's house, the Supreme Court determined that he could object to them as poisonous fruits. See id. at 488.

In a number of cases, we have reinforced the principle that the relevant inquiry in determining whether a defendant has standing to challenge evidence as fruit of a poisonous tree is whether his or her Fourth Amendment rights were violated, not the defendant's reasonable expectation of privacy in the evidence alleged to be poisonous fruit. In United States v. DeLuca, 269 F.3d 1128 (10th Cir. 2001), for example, the defendant, a passenger in a car, moved to suppress methamphetamine taken from the car. Id. at 1130-31. We held that, although the defendant did not have standing to directly challenge the search of the car because he had neither a possessory nor property interest in the car, he had standing to challenge the lawfulness of his detention and thus to seek to suppression of the methamphetamine as fruit of that detention. Id. at 1132. See also United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996) (recognizing that, although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in that

vehicle as the fruit of the illegal detention); United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995) (same).

Contrary to our conclusion, the Third and Fifth Circuits have expressly concluded that, at least absent egregious circumstances,[11] it is erroneous for a district court to suppress the contents of a defendant's A-file because an alien charged with illegal reentry has no possessory or proprietary interest in his immigration file or the documentary evidence contained in that file and thus has no standing to challenge the file's introduction into evidence. See Bowley, 435 F.3d at 431 (citing the expectation of privacy language used in United States v. Pineda-Chinchilla, 712 F.2d 942, 943-44 (5th Cir. 1983)); Pineda-Chinchilla, 712 F.2d at 943-44 (citing Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); Rakas v. Illinois, 439 U.S. 128, 143 (1978)). Contrary to these decisions, we do not read

_____

[11] The Third Circuit specifically held that, "absent the kind of egregious circumstances referred to in Lopez-Mendoza, . . . the Fourth Amendment does not provide a basis for an alien to suppress his/her immigration file, or information in that file." United States v. Bowley, 435 F.3d 426, 431 (3d Cir. 2006); see also Lopez-Mendoza, 468 U.S. at 1039, 1050-51 (qualifying its statement that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest," by noting that it was not in that case considering "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained"); id. at 1051 n.5 (citing as examples of possibly egregious circumstances evidence obtained in a "fundamentally unfair [manner] and in violation of due process requirements of the Fifth Amendment;" evidence obtained "after request for counsel had been repeatedly refused;" or evidence obtained "as a result of a night-time warrantless entry into the aliens' residence") (quotations omitted).

Rawlings or Rakas, nor any other Supreme Court or Tenth Circuit case, to support the proposition that the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding both the violation which constitutes the poisonous tree and separate standing regarding the evidence which constitutes the fruit of that poisonous tree.[12]  Instead, in both Rawlings and Rakas, the Supreme Court merely held that a defendant has standing to seek suppression of evidence only if he "has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge."  Rakas, 439 U.S. at 138; Rawlings, 448 U.S. at 104; see also United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000).

A defendant's standing to challenge the admissibility of evidence deemed fruit of an illegal search and seizure therefore arises from the alleged violation of his Fourth Amendment rights by virtue of the primary illegality; here, the unlawful arrest of Defendant.  There is no independent requirement that a defendant also have standing or a proprietary interest in the items sought to be

_____

[12]  Both Rawlings and Rakas involved defendants who sought to suppress contraband based on the violation of another person's Fourth Amendment rights. See Rakas, 439 U.S. at 137 (involving passengers' challenge to the search of a car they did not own); Rawlings, 448 U.S. at 104-06 (involving a defendant's challenge to the search of someone else's purse).  Rakas did not even involve the fruit of the poisonous tree doctrine.  439 U.S. at 160 n.5.  In Rawlings, the defendant made one fruits argument, claiming that his unlawful statements were a fruit of his unlawful detention.  However, the Supreme Court refused to suppress the defendant's statements because it concluded that the taint of the unlawful detention had been attenuated, not because defendant lacked a privacy interest in the statements.  See 448 U.S. at 106-10.

suppressed under the fruits of the poisonous tree doctrine. See 6 LaFave, supra, § 11.4, at 257 ("[I]t must be cautioned that a defendant . . . can prevail on a 'fruit of the poisonous tree' claim only if he has standing regarding the violation which constitutes the poisonous tree," without reference to any other standing requirements) (emphasis added, footnote omitted). In this case, the Government has conceded on appeal that Defendant himself was unlawfully detained and arrested; thus, Defendant has standing to object to any poisonous fruit obtained as a result of that primary illegality.

### 2. Whether Defendant's A-File constitutes poisonous fruit

Where, as here, a defendant's Fourth Amendment rights were violated, the only relevant question in determining whether evidence is fruit of the poisonous tree and therefore subject to the exclusionary rule is "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993) (quoting Wong Sun, 371 U.S. at 488). In this case, the answer to that question necessarily depends on whether Defendant's fingerprints, which the Government used to secure Defendant's A-file, should be suppressed. If the fingerprints are determined to be suppressible it will be because of a determination that the fingerprints were illegally obtained for the investigative purpose of obtaining Defendant's immigration record and

potentially charging him with a more serious crime. Under such circumstances it seems to us that the A-file is inextricably linked to the fingerprints and if one is a fruit of the poisonous tree (the unconstitutional arrest), then the other is as well. See Wong Sun, 371 U.S. at 484 ("The exclusionary prohibition extends as well to the indirect as the direct products of [Fourth Amendment] invasions."); see also Nardone v. United States, 308 U.S. 338, 341 (1939) ("[T]he knowledge gained by the Government's own wrong cannot be used by it simply because it is used derivatively.") (quotations omitted).

The Government has cited United States v. White, 326 F.3d 1135 (10th Cir. 2003), for the statement that "[t]he exclusionary rule enjoins the Government from benefitting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality." Id. at 1140 (quoting Crews, 445 U.S. at 475 (plurality opinion)). However, neither Crews nor White stand for the proposition that all preexisting Governmental records found as a result of an illegal arrest are exempt from suppression.

In Crews, the Supreme Court expressly noted that "the Fourth Amendment violation . . . yielded nothing of evidentiary value that the police did not already have in their grasp." 445 U.S. at 475 (plurality opinion). The record in that case indicated that

> prior to [the defendant's] illegal arrest, the police both knew respondent's identity and had some basis to suspect his involvement in the very crimes with which he was charged. Moreover, before they approached respondent, the police had already obtained access to the "evidence" that implicated him in the robberies, i.e., the mnemonic representations of the criminal retained by the victims and related to the police in the form of their agreement upon his description. In short, the Fourth Amendment violation in this case yielded nothing of evidentiary value that the police did not already have in their grasp. Rather, respondent's unlawful arrest served merely to link together two extant ingredients in his identification.

Id. (footnote omitted) (plurality opinion). It is in this context that the Supreme Court stated that "[t]he exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality." Id. (plurality opinion). In this case, by contrast, while Defendant's A-file was not developed as the result of any illegal activity, but rather was compiled prior to, and independently of, the illegal seizure of Defendant, the Border Patrol in this case did not effectively have Defendant's A-file in their grasp. Instead, the practicality of the situations is that they obtained Defendant's A-file only by first taking his fingerprints.

In White, we held that defendant's identity and the discovery of his status as a felon from criminal history records were not suppressible. However, we did so based on the doctrine of inevitable discovery, concluding that after the defendant voluntary gave the officers his name, an NCIC check using that name revealed an outstanding warrant that would have inevitably led to the defendant's

arrest and the subsequent discovery of his prior felony conviction regardless of the illegal search. 326 F.3d at 1138. In refusing to suppress the defendant's status as a felon, we also noted that, at the time the illegal search was conducted, the officers neither knew of nor sought information about the defendant's status as a felon and consequently the illegal search was not exploited for the purpose of determining White's identity or his prior felony status. Id. at 1140. Accordingly, in White, we merely reiterated the general rule that evidence gained through exploitation of illegal police conduct must be suppressed unless that evidence would have been inevitably discovered. We did not announce a new rule prohibiting suppression of all previously compiled Government records regardless of whether exploitation of an illegal search and seizure produced the critical link between a defendant's identity and his immigration or prior criminal history record.

In this appeal, the Government does not argue inevitable discovery. Additionally, for the reasons explained earlier, it is possible that, in contrast to White, the police in this case exploited the illegal detention of Defendant by taking his fingerprints for the very purpose of investigating his immigration or prior criminal history status. Where, as may prove to be the case here, obtaining information regarding a defendant's immigration status and prior criminal history proves to be the objective of official illegality, the deterrence purpose of the exclusionary rule would effectively be served only by excluding the very

evidence sought to be obtained by the primary illegal behavior, not just the means used to obtain that evidence. See Elkins, 364 U.S. at 217 ("[The] purpose [of the exclusionary rule] is . . . to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."); see also Excluding From Evidence, supra, 69 YALE. L.J. at 436 n.24 (noting that the effectiveness of the exclusionary rule depends on excluding the piece of evidence that is the target of police activity).

The answer to whether Defendant's A-file "[was] come at by exploitation" of illegal conduct necessarily depends on whether Defendant's fingerprints were obtained for an investigatory purpose exploiting the unconstitutional arrest or whether they were obtained as part of a routine booking procedure not linked to the purpose of the illegal arrest. Because the officers used Defendant's fingerprints to obtain his A-file, if those fingerprints are determined to be suppressible as fruits of the poisonous tree, then it follows that the A-file should also be suppressed. Accordingly, whether Defendant's A-file should be suppressed will need to be decided on remand in conjunction with the evidentiary hearing regarding Defendant's fingerprints.

## CONCLUSION

For the reasons outlined above, we hold that the Supreme Court's language in Lopez-Mendoza that the "identity" or "body" of a suspect may never be suppressed applies only to jurisdictional challenges over the body of the

defendant based upon an illegal arrest or search and does not preclude application of ordinary Fourth Amendment exclusionary rule analysis to determine the admissibility of evidence. We AFFIRM the district court's opinion insofar as it relates to the suppression of Defendant's oral statements. However, we REVERSE the court's decision to suppress the fingerprints taken after Defendant's arrest and the contents of the A-file. Those matters are REMANDED for further proceedings consistent with this opinion.

No. 04-2194, United States v. Olivares-Rangel

**BALDOCK**, Circuit Judge, dissenting:


Unable to agree on the meaning of I.N.S. v. Lopez-Mendoza, 468 U.S. 1032 (1984), lower federal courts are divided on the question of whether, given an unlawful seizure, the "identity" of an illegal immigrant may be suppressed in the context of a § 1326 prosecution. Compare, e.g., United States v. Guzman-Bruno, 27 F.3d 420 (9th Cir. 1994) (answering no); United States v. Roque-Villanueva, 175 F.3d 345 (5th Cir. 1999) (same); United States v. Navarro-Diaz, 420 F.3d 581 (6th Cir. 2005) (same), and United States v. Bowley, 435 F.3d 426 (3d Cir. 2006) (same), with United States v. Guevara-Martinez, 262 F.3d 751 (8th Cir. 2001) (answering yes), and United States v. Garcia-Beltran, 389 F.3d 864 (9th Cir. 2004) (same); see also United States v. Cisneros-Cruz, 1999 WL 444926 (10th Cir. 1999) (unpublished) (answering no); United States v. Alvarez-Becerra, 33 Fed. Appx. 403, 409 (10th Cir. 2002) (unpublished) (Briscoe, J., concurring) (same).[1] Today, this Court prematurely and needlessly joins the debate by asking

---

[1] In her concurring opinion in Alvarez-Becerra, Judge Briscoe soundly refutes this Court's interpretation of Lopez-Mendoza's language regarding the identity of a defendant:

Although the Court's statement was initially made in response to the jurisdictional argument that respondent Lopez-Mendoza should not be subject to prosecution because his arrest was illegal, the Court reiterated the statement when addressing respondent Sandoval-Sanchez' evidentiary argument and the relative value of the exclusionary rule in

(continued...)

a question it need never reach, i.e., "whether evidence of a defendant's identity (including statements, fingerprints, and an A-file) may ever be suppressed as the 'fruit' of an unlawful arrest." Court's Op. at 9. For reasons to become apparent, the simple fact is Defendant's arrest was not unlawful.

In my view, the proper analysis of this case begins with the question of whether Agent Armendariz' immediate identification of Defendant as an illegal immigrant constitutes evidence which the district court may suppress on the basis of an illegal stop and detention. The answer to this question is critical because, unlike the facts in any of the foregoing cases, Agent Armendariz' prompt recognition of Defendant as an illegal immigrant, prior to any questioning or fingerprinting, provided the agent probable cause to arrest him and take him into custody for processing. Probable cause arose from Agent Armendariz' knowledge of Defendant's status and his observation of Defendant's person. See United States v. Soto, 375 F.3d 1219, 1222 (10th Cir. 2004) (probable cause demands more than mere suspicion but does not require facts sufficient for a finding of

---

[1](...continued)
deportation proceedings. The clear import of the Court's statement is that the "identity" of a defendant is not itself suppressible; that is, the mere fact that a defendant was illegally brought before the court or that his or her identity was learned as a result of an illegal search or arrest does not mean that the government will not be allowed to prove the defendant's identity.

33 Fed. Appx. at 409 (internal citation omitted) (citing Roque-Villanueva and Guzman-Bruno with approval).

guilt). "Once the vehicles were bumper to bumper, Armendariz *immediately* recognized the passenger of the pickup as Gustavo Olivares-Rangel . . . , an immigrant he had arrested a month or two before for being in the United States illegally." Court's Op. at 3 (emphasis added). In Agent Armendariz' own words: "The only one person, in my mind, that could not leave was the [Defendant], *because I already knew he was here illegally*." Govt's App. at 31 (emphasis added). If Agent Armendariz' visual identification of Defendant as an illegal immigrant cannot be suppressed, neither can discovery of his alien file. This is because discovery of Defendant's alien file resulted from a routine booking procedure, *i.e.*, fingerprinting, following his arrest based on probable cause.

By shirking the obvious, the Court makes this case unnecessarily difficult. The Court reasons that because the Government has conceded Defendant's arrest was unlawful, it has no choice but to proceed accordingly. Court's Op. at 6-7 & nn. 2,3. Although the Government's argument (both oral and written) in this case is lacking, I can find nowhere in the record, briefs, or oral argument recording where the Government concedes Defendant's custody was unlawful *once Agent Armendariz recognized Defendant as an illegal immigrant*. Rather, the Government concedes only that Agent Armendariz lacked probable cause (or more properly reasonable suspicion) to stop the vehicle and detain Defendant.[2]

_____

[2] Of course, a vehicle stop constitutes a detention of both driver and
(continued...)

- 3 -

The clearest expression of the Government's concession is contained in its reply

brief:

> The government has not appealed the district court's determination that Border Patrol's stop of Olivares-Rangel was unlawful. The government concedes that point for purposes of this appeal. But even assuming that Olivares-Rangel's identity was discovered as a result of an illegal stop, his identity and status as a deported alien cannot be suppressed.

Govt's Reply Br. at 6. The Court fails to distinguish, as it did in its questioning

at oral argument, between Agent Armendariz' lack of probable cause to stop the

vehicle and detain Defendant, and Agent Armendariz' probable cause to arrest

Defendant once he recognized Defendant as an illegal immigrant.

The district court made the same mistake by conflating the stop and

detention with the arrest:

> Agent Armendariz stopped the vehicle in which Olivares-Rangel was riding without reasonable suspicion or probable cause. The stop and arrest violated the Fourth Amendment. . . .
>
> Agent Armendariz's recognition of Olivares-Rangel cannot provide a valid foundation for reasonable suspicion [or probable cause] because it was obtained by the exploitation of the illegality of the arrest. . . .

United States v. Olivares-Rangel, 324 F.Supp.2d 1218, 1222-1223 (D.N.M. 2004).

That the district court erroneously viewed the agent's recognition of Defendant as

the "fruit" of an unlawful stop and detention (or an arrest as the district court and

---

[2](...continued)
passenger. See United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989) (recognizing a passenger's standing to challenge a vehicle stop as a form of detention).

Government sometimes inartfully refer to it), rather than as an independent basis for probable cause to arrest Defendant, is painfully apparent. This Court's failure to recognize this critical distinction leads it to erroneously conclude the Government has conceded Defendant's arrest was unlawful.

Viewing the Government concession in the proper context, the faulty premise underlying any conclusion that Defendant was entitled to suppression of his fingerprints and alien file is simply this: Defendant's arrest was unlawful because the prior stop of the vehicle in which he was a passenger was unlawful. That premise, on which the district court based its decision, has certain appeal. *But for* the illegal stop, Agent Armendariz might never have recognized Defendant as an illegal immigrant whom he had arrested a few weeks prior. Yet the Supreme Court has "never held that evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal conduct of the police." Hudson v. Michigan, 126 S.Ct. 2159, 2164 (2006) (internal quotations omitted).[3]

---

[3] Although my dissent does not turn on the cost/benefit analysis underlying the exclusionary rule's application, I find interesting that the Court makes scant mention of Lopez-Mendoza's lengthy discussion as to why suppression of an illegal immigrant's identity has little deterrent effect on illegal detentions. 468 U.S. at 1042-46. The Supreme Court observed that "only a very small percentage of arrests of aliens are intended or expected to lead to criminal prosecutions." Id. at 1043. Rather, a border patrol agent's primary objective is to obtain the deportation of illegal immigrants. Indeed, Agent Armendariz testified that the other three men in the vehicle with Defendant were simply returned to Mexico.
(continued...)

Nor has the Supreme Court ever held a "[defendant's] person should be considered evidence, and therefore a possible 'fruit' of police misconduct." United States v. Crews, 445 U.S. 463, 475 (1980) (plurality); see also New York v. Harris, 495 U.S. 14, 18 (1990). And I would not so hold today. This is because an individual has no reasonable expectation of privacy in his visual appearance when exposed to the public eye. See United States v. Santana, 427

---

[3](...continued)
Govt's App. at 47. Little deterrent value attaches to squelching illegal detentions because the "person and identity" of an illegal immigrant are not suppressible in civil deportation proceedings. 468 U.S. at 1043. Moreover, 97.5% of arrested illegal immigrants agree to voluntary deportation:

> Every [border patrol] agent knows, therefore, that it is highly unlikely that any particular arrestee will end up challenging the lawfulness of his arrest . . . . When an occasional challenge is brought, the consequences from the point of view of the officer's overall arrest and deportation record will be trivial. In this circumstances, the arresting officer is most unlikely to shape his conduct in anticipation of the exclusion of evidence . . . .

Id. at 1044. Finally, because a defendant may be reindicted for violating § 1326 notwithstanding an illegal detention, suppressing his identity would have little practical deterrent effect on border patrol agents. See United States v. Ortiz-Hernandez, 427 F.3d 567, 576-79 (9th Cir. 2005); Navarro-Diaz, 420 F.3d at 588. The cost of suppression on the other hand is far from slight, see Court's Op. at 26 n.9, because, among other reasons, the inquiry into an agent's subjective motivations places yet another burden on border courts already swamped with immigration cases. Accordingly, Lopez-Mendoza may mandate that Defendant's motion to suppress his fingerprints and alien file be denied notwithstanding any Fourth Amendment violation. See Hudson, 126 S.Ct. at 2163 (noting the exclusionary rule is "applicable only where its remedial objectives are thought most efficaciously served, that is, where its deterrence benefits outweigh its substantial social costs") (internal quotations and citations omitted).

U.S. 38, 42 (1976). No one, Defendant nor anyone else, had any legitimate expectation of privacy in his appearance when Agent Armendariz spotted him. See United States v. Carter, 360 F.3d 1235, 1239-40 (10th Cir. 2004) (recognizing that looking through a car's window invades no legitimate expectation of privacy). When Defendant stepped into the vehicle, he placed himself in a position for all the world to see:

> The general public could peer into the interior of . . . [the] automobile from any number of angles; there is no reason . . . [Agent Armendariz] should be precluded from observing as an officer what would be entirely visible to him as a private citizen. There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle . . . .

Texas v. Brown, 460 U.S. 730, 740 (1983) (plurality) (internal citations omitted).

The illegality of the initial stop and detention does not dictate this Court's analysis of the suppression issue because it revealed something which cannot be suppressed, namely, Defendant's appearance. The law did not require Agent Armendariz to "hide his eyes and count to ten" before lawfully arresting Defendant based on his unlawful presence in this country, an ongoing crime. See United States v. Jimenez-Borja, 378 F.3d 853, 857 (9th Cir. 2004) ("The crime of being 'found in' is a continuing offense."). If Agent Armendariz had recognized Defendant as a fugitive from justice convicted of murder, would Defendant's arrest have been unlawful? "The constable's blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the

- 7 -

commission of an ongoing crime." Lopez-Mendoza, 468 U.S. at 1047. Under these circumstances, Agent Armendariz' failure to arrest Defendant would have "clearly frustrate[d] the express public policy against an alien's unregistered presence in this country. Even the objective of deterring Fourth Amendment violations should not require such result." Id.[4]

Because, prior to any questioning or fingerprinting, Agent Armendariz identified Defendant's person as that of an illegal immigrant, this case is unlike

---

[4] Any suggestion that an ultimate resolution in favor of Defendant in this case will exempt him from criminal prosecution under § 1326 is mistaken. The Government is now aware of Defendant's identity and, after thirty months, that knowledge is surely sufficiently attenuated from Agent Armendariz' initial encounter with Defendant on February 2, 2004. Because the violation of § 1326 is an ongoing crime, the Government may make use of its knowledge to recharge Defendant with illegal entry and require him to submit to fingerprinting. See Garcia-Beltran, 443 F.3d at 1127-35. Perhaps the Sixth Circuit said it best in Navarro-Diaz, 420 F.3d at 587:

> If [defendant's] identity may be suppressed, the moment the court lets him go, he is immediately committing the continuing violation of being present in the United States after having been deported. . . .

> Directing the district court to grant [defendant's] suppression motion, therefore, would not affect the ultimate outcome of the charge against him. If the government were forced to drop its prosecution of [defendant], the police could simply approach him on his way out of the courtroom door and demand that he identify himself.

(internal quotations omitted); see also Ortiz-Hernandez, 427 F.3d at 577 ("While the original set of [defendant's] fingerprints should be suppressed as wrongfully obtained, the government is now aware of [defendant's] identity; it may rely on his identity, as well as his criminal and immigration record, in bringing § 1326 criminal charges against him.").

- 8 -

any case on which the Court relies to support its holding. Davis v. Mississippi, 394 U.S. 721 (1969) and Hayes v. Florida, 470 U.S. 811 (1985), two cases on which the Court extensively relies, have no bearing upon our case. The issue in those cases was whether the police, *in the absence of probable cause*, could detain defendants for the *sole purpose* of taking their fingerprints as part of a criminal investigation. The Court said absolutely not, and correctly so. "Detentions for the sole purpose of obtaining fingerprints are . . . subject to the constraints of the Fourth Amendment." Davis, 394 U.S. at 727. In other words, "in the absence of probable cause . . . investigative detentions at the police station for fingerprinting purposes [can] not be squared with the Fourth Amendment." Hayes, 470 U.S. at 815. In stark contrast to Davis and Hayes, Agent Armendariz did not take advantage of Defendant's initially unlawful detention to obtain his fingerprints. Rather, Agent Armendariz arrested and fingerprinted Defendant because he had probable cause to do so based upon his visual identification of Defendant's person and prior knowledge of Defendant's status.[5]

Properly applying the law to the facts of this case, I cannot agree that Defendant Olivares-Rangel's fingerprinting may have been for investigative

---

[5] Agent Armendariz' identification of Defendant further distinguishes our situation from Guevara-Martinez, 262 F.3d at 751, an Eighth Circuit case extensively relied on by this Court. In that case, officers unlawfully detained defendant while they investigated his immigration status. That investigation included fingerprinting defendant to reveal his true identity as an illegal immigrant.

purposes rather than simply part of a routine booking procedure. No remand for further fact-finding is necessary. Regardless of whether Defendant's fingerprints were taken in anticipation of civil deportation or criminal prosecution, Defendant was lawfully in custody when taken to headquarters for fingerprinting because Agent Armendariz had probable cause to arrest him apart from any statements Defendant may have made.[6] The Government makes the very point – Agent Armendariz did not take Olivares-Rangel into custody to obtain his fingerprints in the hope of connecting him to a crime: "In this case, the agent immediately recognized Olivares-Rangel as a person he had previously arrested for being in the United States illegally, and his fingerprints were taken to process him as an illegal alien[.]" Govt's Br. at 10-11. The discovery of Defendant's A-file follows as a routine matter from Defendant's fingerprinting pursuant to an arrest based on probable cause. That should be the end of our analysis and the end of Defendant's motion to suppress his fingerprints and A-file.[7] I dissent.

---

[6] Of course, I do not agree that Defendant's subsequent statements may be suppressed under the Fourth Amendment as the "fruit" of an unlawful arrest. Those pre-*Miranda* statements, however, *might* be suppressed under the Fifth Amendment's proscription against self incrimination. See United States v. Parra, 2 F.3d 1058, 1067-68 (10th Cir. 1993).

[7] In view of the foregoing analysis, I need not discuss whether Defendant's A-file might be suppressed as the "fruit" of an unlawful arrest. See Guzman-Bruno, 27 F.3d at 421-22 (Wallace, J.) ("[T]here is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or other independent evidence.") (internal quotations omitted).