PREGERSON, Circuit Judge,
concurring:
I write separately to explain why it is unfair for the Government to encourage noncitizens to apply for immigration relief, and at a later date use statements in those relief applications. against noncitizens in removal proceedings.
The Government should not be permitted to use noncitizens’ applications for immigration relief to remove noncitizens from their homes and their families in our country. When the Government enacts immigration relief programs, it encourages noncitizens to apply because there are “significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.” Plyler v. Doe, 457 U.S. 202, 220, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).
The Government asks noncitizens to provide personal information to receive benefits, such as driver’s licenses, visas, deferred action, and work authorization. But because noncitizens are afraid that the Government could at a later, date use that information against them, many are reluctant to apply. See Angélica Cházaro, Challenging the “Criminal Alien” Paradigm, 63 UCLA L. Rev. 594, 642-43 (2016) (“Coming out of the shadows to be counted and accounted for, however, while it may bring the benefits of work authorization and a social security number, involves stepping into the potential net of immigration enforcement.”).
The Government’s practice in this regard contradicts the principle of welcoming immigrants into our communities. This practice also contradicts President Kennedy’s view that our nation’s “[immigration policy should be generous; it should be fair; it should be flexible.” John Fitzgerald Kennedy, A Nation of Immigrants (1964). *914 We should encourage, not punish, nonciti-zens who come out of the shadows seeking avenues to lawful status.
I am also concerned about the Government’s argument that the exclusionary rule does not apply to Sanchez’s Family Unity Benefits and Employment Authorization applications because they predate the egregious constitutional violation. See United States v. Del Toro Gudino, 376 F.3d 997 (9th Cir. 2004).
Categorically exempting applications that predate an egregious constitutional violation from the exclusionary rule allows immigration and other law enforcement agencies to prey on migrant and working-class communities. Law enforcement officers can unconstitutionally round up migrant-looking individuals, elicit their names, and then search through Government databases to discover incriminating information in pre-existing immigration records. See Eda Katharine Tinto, Policing the Immigrant Identity, 68 Fla. L. Rev. 819, 864 (2016).
Nothing prevents law enforcement from engaging in this unfair tactic if, as the Government contends, immigration records that predate an egregious constitutional violation can never be the fruit of the poisonous tree. See Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (“[The] purpose [of the exclusionary rule] is ... to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.”); United States v. Olivares-Rangel, 458 F.3d 1104, 1120 (10th Cir. 2006) (“[T]he deterrence purpose of the exclusionary rule would effectively be served only by excluding the very evidence sought to be obtained by the primary illegal behavior, not just the means used to obtain that evidence.”).
This troubling end-around the exclusionary rule corrupts our justice system. The Government should not be allowed to flout the protections of the Fourth Amendment and then use a noncitizen’s application for immigration relief against her or him. We should foster communication, not distrust, between migrant communities and law enforcement.